DAVID JEFFREY COMPANY, Appellant, vs. CITY OF MIL-WAUKEE and others, Respondents.

*September 10—October 5, 1954.*

562

564

566

568

For the appellant there was a brief and oral argument by *Robert P. Goodman* and *Herbert M. Hiller,* both of Milwaukee.

For the respondents there was a brief by *Walter J. Mattison,* city attorney, and *Harry G. Slater,* first assistant city attorney, and oral argument by *Mr. Slater.*

A brief was filed by *Dorsey & Coggs,* attorneys, and *Phillips & Phillips* of counsel, all of Milwaukee, as *amici curiae.*

STEINLE, J. The specific questions presented for determination are:

May the city of Milwaukee under the provisions of section 66.43, Wisconsin statutes, acquire and assemble areas which are blighted for the purpose of clearing such areas and redeveloping them so as to prevent the spread or recurrence of slum conditions or conditions of blight in such areas and, after such acquisition, contract with respect thereto or sell and lease such areas to private persons or redevelopment corporations?

May the city of Milwaukee use its credit or expend tax funds in acquiring blighted areas or portions thereof incidental to the proper clearance and redevelopment of areas where such blight exists?

May the legislature properly delegate to the common council of the city of Milwaukee the authority to determine proposed boundaries of a project area proposed for redevelopment, the redevelopment plan of the project area, and the finding by the common council after public hearing that such redevelopment plan of a project area is feasible and in conformity with the general plan of the city?

Does adoption by the Housing Authority of the city of Milwaukee of boundaries of a redevelopment project area under the provisions of 66.43, Stats., without giving notice of hearings to property owners within the area and without findings upon which it bases its determination as to the boundaries of the project area of "blight," violate the "due process" clause of section 1, of the Fourteenth amendment of the United States constitution?

The principal controversy in the case arises out of the provisions of the Blighted Area Law granting to cities the

power of eminent domain. Both parties agree that the right of eminent domain can be exercised for the taking of private property only for *public use*. The underlying consideration in this cause is the character of the use to be made of the property which sec. 66.43, Stats., permits cities to acquire by eminent domain.

Appellants contend that notwithstanding the fact that the public may derive incidental benefits from the application of these statutory provisions, the term *public benefit* is not synonymous with that of *public use,* and that the program authorized by the statute is not for a *public use* as that term has been defined in this state.

The courts are not in agreement as to the tests to be applied in determining whether a use is public. Some courts have gone so far in the direction of a liberal construction as to hold that *"public use"* is synonymous with *"public benefit," "public advantage," "public interest,"* or *"public welfare."* Other courts have adopted a strict construction holding in effect that *"public use"* means the right of the public to a definite and fixed use of the property appropriated.

Sec. 13, art. I of the Wisconsin constitution, declares: "The property of no person shall be taken for public use without just compensation therefor."

In *Whiting v. Sheboygan & Fond du Lac R. Co.* (1870), 25 Wis. 167, it was held that the *"public use"* which authorizes the exercise of the power of eminent domain implies a possession, occupation, and enjoyment of the land by the public, or public agencies. In declaring such principle, this court there, at pages 194 to 196, said:

"The incidental public benefits or advantages, though in a general sense to be considered, do not, therefore, constitute in the sense of the law a public use, which will justify the interference of the government; and the question is, in what does such use consist in the case of these railroads owned

and operated by private corporations? We have seen that certain uses are *per se* public, and that others have been pronounced so by the courts, and, among the latter, railroads. Eminent domain is the right of the government to seize private property for public use, upon payment of just compensation to the owner. It is a power which must be exercised by the government or sovereign, and for the public use only. . . . The *'public use,'* says Judge COOLEY, in his excellent treatise on Constitutional Limitations, 531, 'implies a possession, occupation, and enjoyment of the land by the public, or public agencies.' . . . It appears, then, that the *public use* consists in the *possession, occupation, and enjoyment of the land itself by the public, or public agencies,* and not in any incidental benefits or advantages which may accrue to the public from enterprises of this nature. But the question before us calls for a more precise definition as to how it is that the public may be said to possess, occupy, and enjoy the land condemned for the use of these railroad companies. . . . The public use, therefore, which has been held to justify the application of the doctrine of eminent domain in the case of these railroads owned and operated by private individuals, consists in the fact that the owners cannot, without reasonable excuse, refuse to receive and transport passengers and freight when offered at usual rates, and in the fact that *the state retains the power to regulate and control the franchise, and limit the amount of tolls which it shall be lawful for the owners to charge.* The use consists in these facts, and these alone. And as a man may be said to possess and enjoy the estate of another, the use of which by that other he may regulate and control, so that it shall not be turned to his detriment or disadvantage, so the public, through this reserved power of the state, may be said to possess and enjoy the land condemned for use by these railroad companies. And this is the public use, which has been held to justify the exercise of the power of eminent domain in behalf of such corporations, a power which, by the barrier erected by the constitution, requiring payment of full compensation to the owner, is far less susceptible of legislative abuse, and far less dangerous to private right, than the power of taxation."

This court has not departed from its construction of the term *"public use"* announced in *Whiting v. Sheboygan & Fond du Lac R. Co., supra.*

In Oregon, where the term *"public use"* has been construed as by this court, it was said:

"The courts, including this court, which take the opposing view assert that there is a distinction between a public use and a benefit to the public, and that private enterprises that give employment to many people and produce large quantities of commodities of various kinds are not necessarily public uses; and that the term 'public use' as used in constitutions is not synonymous with the term 'public benefit.' . . . The idea emphasized by this main line of decisions is expressed by Judge COOLEY, thus:

" 'The public use implies a possession, occupation, and enjoyment of the land' by the public or public agencies, and it is not enough 'that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises.' Cooley's Constitutional Limitations. (7th ed.) 766." *Smith v. Cameron* (1922), 106 Or. 1, 14, 210 Pac. 716, 27 A. L. R. 510.

And the court in said case quoted with approval 1 Lewis, Eminent Domain (2d ed.), p. 415, sec. 165:

" 'The use of a thing .is strictly and properly the employment or application of the thing in some manner. The public use of anything is the employment or application of the thing by the public. Public use means the same as use by the public and this it seems to us is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are: First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier constitutions; third, it is the only view which gives

the words any force as a limitation or renders them capable of any definite and practical application.

" 'If the constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use and the act of appropriation is void. . . .' "

The legislature under sec. 66.43, Stats., has made an express finding of the existence of slum and blighted areas in cities of the state. It designates such condition as a serious and growing menace contributing substantially and increasingly to the spread of disease and crime, and requiring maintenance of adequate police, fire, and accident protection, and other public services. It declares that such existence impairs or arrests the sound growth of cities and retards the provisions of housing accommodations. It finds that the menace of slum clearance is beyond remedy and control solely by the regulatory processes in the exercise of police power and cannot be dealt with by ordinary operations of private enterprises without the aids provided for its enactment. Specifically, by terms of the statute itself, the legislature has found and declared that the acquisition of property in such areas by eminent domain for the purposes of eliminating the condition and to prevent recurrence, and the removal of structures and improvement of sites therein and the redevelopment thereof according to plan, and assistance given in connection therewith, are *public uses* and *purposes* for which property may be acquired in such manner.

It is within the province of the legislature to declare public use or purpose. In *Schumm v. Milwaukee County* (1951), 258 Wis. 256, 265, 45 N. W. (2d) 673, we said, "Primarily,

the right to declare what is a public use is vested in the legislature. 18 Am. Jur., Eminent Domain, p. 675, sec. 46."

It is the function of the court to decide whether the particular use for which the property is sought to be condemned is public or private. In *Wisconsin Water Co. v. Winans* (1893), 85 Wis. 26, 40, 54 N. W. 1003, it was said:

"Of course, the legislature or its agency must, in the first instance, determine whether the use for which it is proposed to make the condemnation is a public use; but such determination is not final as to the character of the use. Lewis, Em. Dom. sec. 158. In the same section it is said: 'All the courts, we believe, concur in holding that whether a particular use is public or not, within the meaning of the constitution, is a question for the judiciary.' "

In the case of *In re Southern Wisconsin Power Co.* (1909), 140 Wis. 245, 263, 122 N. W. 801, it was said:

"The right of the courts to decide whether the purpose is public for which it is proposed to condemn property is undoubted. Such a rule does not preclude the courts from according proper deference to legislative declarations as to what constitutes a public purpose."

In *State ex rel. McClure v. Hagerman* (1951), 155 Ohio St. 320, 325, 98 N. E. (2d) 835, it was said:

"Generally, a [the] public purpose [for which a municipal corporation can expend money] has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. . . .

" 'The determination of what constitutes a public purpose [for which a municipality may expend money] is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such

determination is palpable and manifestly arbitrary and incorrect.' "

The validity of a statute must be sustained unless it palpably contravenes a provision of the state or federal constitutions. This court is bound to give to an act a construction that will avoid constitutional objections to its validity if it will bear such construction. *State v. Coubal* (1946), 248 Wis. 247, 21 N. W. (2d) 381.

The constitutionality of slum-clearance laws has been almost uniformly upheld by courts of last resort in many states. Legislation combining slum-clearance and urban-redevelopment projects, similar to the Blighted Area Law under consideration, have also been upheld in many jurisdictions. *Foeller v. Housing Authority of Portland* (1953), 198 Or. 205, 256 Pac. (2d) 752; *Opinion of the Justices* (1950), 254 Ala. 343, 48 So. (2d) 757; *Rowe v. Housing Authority of Little Rock* (1952), 220 Ark. 698, 249 S. W. (2d) 551; *People ex rel. Tuohy v. Chicago* (1948), 399 Ill. 551, 78 N. E. (2d) 285; *Belovsky v. Redevelopment Authority of Philadelphia* (1947), 357 Pa. 329, 54 Atl. (2d) 277; *Ajootian v. Providence Redevelopment Agency* (R. I. 1952), 91 Atl. (2d) 21; *Nashville Housing Authority v. Nashville* (1951), 192 Tenn. 103, 237 S. W. (2d) 946; *Opinion to the Governor* (1949), 76 R. I. 249, 69 Atl. (2d) 531; *Herzinger v. Baltimore* (Md. 1953), 98 Atl. (2d) 87. Urban-redevelopment corporation laws have also been held valid. *Zurn v. Chicago* (1945), 389 Ill. 114, 59 N. E. (2d) 18; *Redfern v. Jersey City* (1948), 137 N. J. L. 356, 59 Atl. (2d) 641; *Murray v. LaGuardia* (1943), 291 N. Y. 320, 52 N. E. (2d) 884; *Zisook v. Maryland-Drexel Neighborhood Redevelopment Corp.* (Ill. 1954), 121 N. E. (2d) 804; and *People ex rel. John Gutknecht v. Chicago,* (Ill. 1954), 121 N. E. (2d) 791. True, in these cases there was not uniform construction of the term *public use.* Some of these

cases involved consideration of programs of a type especially authorized by state constitution provisions. In others, the term *public use* was construed as being interchangeable with *public benefit*. Some involved the same construction that this court has placed upon the term. *Foeller v. Housing Authority of Portland* (1953), 198 Or. 205, 256 Pac. (2d) 752, involved consideration of the validity of a redevelopment law in a jurisdiction committed to the strict construction of *public use,* as exists in this state. In that case it was said (p. 233):

". . . the term 'public use,' in our constitution, means a more intimate relationship between the public and an item of property which has been acquired under the power of eminent domain than is denoted by terms such as 'public benefit' and 'public utility.' 'Public use' demands that the public's use and occupation of the property must be direct. If someone other than the public uses the property, the fact that the public will share in the benefits does not suffice. It must be the public which will use and occupy the property upon its acquisition. In the present instance, it is clear that if the attacked statute is sustained as valid it will be a public body, the Housing Authority, and not a private person, which will be authorized to acquire the property in the Vaughn street area. Likewise, upon its acquisition and before its resale or lease, if either ever occurs, it will 'be a public body, the Housing Authority, which will use, possess, and occupy the property. No private person will use, possess, have an interest in, or make a profit out of it."

The first question raised by the appellants upon this appeal is: May the city of Milwaukee under the provisions of sec. 66.43, Stats., acquire and assemble areas which are blighted for the purpose of clearing such areas and redeveloping them so as to prevent the spread or recurrence of slum conditions or conditions of blight in such areas and, after such acquisition, contract with respect thereto or sell and lease such areas to private persons or redevelopment corporations?

The appellant contends that the acquisition of land by eminent domain as permitted by the Blighted Area Law for blight clearance and redevelopment of blighted areas is not for such *public use* as is contemplated by sec. 13, art. I of the state constitution. It maintains that the clearance of areas as permitted by the act does not entail (other than actual occupation for the short length of time involved in destroying the properties), any *public use* as that term is construed in this state. · It argues that the mere fact that the city's agents or servants will raze the buildings does not give such project the character of public use. It contends further that the condemnation of *vacant* land in a designated blighted area will serve no *public use*.

The legislature's enactment stems from the police power of the state. The use of all property is subject to the police power of the state, to be exercised for the protection of the health, safety, and general welfare of the public, either directly or through subordinate agencies to whom the exercise of such prerogative may be intrusted. The legislature's findings and declarations indicate that the health, safety, morals, and general welfare of the people are being seriously threatened by the conditions which are found to exist. The act provides a method for the elimination of the conditions and the prevention of their recurrence. Obviously, the legislature is of a mind that the police power, unaided by the power of eminent domain, is inadequate to attain the results which it desires to accomplish. The legislature permits the acquisition of property for the purposes enumerated in the statute, and declares that such acquisition is for a public use. While a legislature's finding that a taking of property which a measure authorizes will be for the public use, is not binding upon the courts, the latter will accord respect to the views of the legislature. As stated in *Smith v. Cameron* (1922), 106 Or. 1, 10, 210 Pac. 716:

". . . the courts will always enter upon an inquiry concerning the validity of a statute authorizing the exercise of the power of eminent domain with the presumption that a use is public if the legislature has declared it to be such."

No act of the legislature can be held unconstitutional unless it is plainly and unquestionably in violation of the will of the people as declared in the fundamental law. When the public nature of the use for which a taking has been authorized by law is disputed, the question, as it presents itself to the courts, is whether the legislature might reasonably have considered the use public. The presumption is that such use is public if the legislature has declared it to be such. The decision of the legislature must be treated with the consideration due to a co-ordinate department of the government of the state. 18 Am. Jur., Eminent Domain, p. 675, sec. 46.

The determination of what constitutes a public municipal purpose is primarily a function of the legislative body, subject to a review by the courts, and such determination by the legislative body will not be overruled by the courts except in instances where that determination is manifestly arbitrary or unreasonable. *State ex rel. Gordon v. Rhodes* (1951), 156 Ohio St. 81, 100 N. E. (2d) 225.

It was clearly within the province of the legislature to have made the findings appearing in sec. 66.43, Stats. There is no challenge of those findings in this cause, and their verity must be accepted. That there is public need for the elimination of blighted areas and for the prevention of the recurrence of such conditions in cities of the state, is uncontradicted. It appears plain that the controlling motive for the ridding of blight and the assurance of its nonrepetition is the safeguarding of the public's health, the public's safety, and the public's welfare. When property is acquired for the purposes of eliminating and preventing blighted conditions as provided for by the statute,—that the public will possess, occupy, and enjoy the same, is clear. We have no difficulty in concluding that the

condemnation of property for the elimination of blighted areas and the prevention of the recurrence of blight in such places is for public purpose and public use. We concur with the views expressed in *State ex rel. Bruestle v. Rich* (1953), 159 Ohio St. 13, 27, 110 N. E. (2d) 778, that:

"We do not believe that anyone will seriously contend that the elimination of slum and other conditions of blight and provisions against their recurrence would not be conducive to the public welfare and a public purpose, . . ."

As hereinbefore indicated, there are many courts of last resort which have reached the same conclusion when determining blight and slum-clearance laws.

The act is directed against areas, and not individual structures. The public, through the municipality, acquires the land in the area and uses it for its own protection against the menace which threatens. It also, by plan, provides for the redevelopment of the area to assure against repetition of blight. It is as much a public purpose to prevent recurrence of blight as to eliminate it. As stated by the learned trial court in its opinion of record herein:

"A careful study of the Blighted Area Law plainly indicates that it has as its purpose the elimination of blight conditions and the prevention of the recurrence thereof by the *acquisition* of blighted areas, the *clearance* of such areas by demolition or removal of structures thereon and the administration of such areas in accordance with a redevelopment plan.

"The municipality will acquire the land by purchase or condemnation, and, however acquired, it is the municipality in fact which will own the land in fee simple. Having acquired the land, it is the municipality, the public, which will use the same in the demolition and removal of structures (either directly or through lessees or purchasers), streets, utilities, and other improvements thereon. Having acquired the lands, it is the municipality, the public, which will use the lands in the construction of streets, the installation of utilities and other site improvements, all in accordance with an approved redevelopment plan. It is clearly evident that

these redevelopment plans in project areas are intended to fit in and conform to the general plan of the city, with particular reference to land uses, improved traffic plans, transportation facilities, parks, and other public uses, which characterize its public purpose."

Clearly, such a program is for a public use, not only with respect to the elimination of the blighted condition, but also with respect to effort in preventing recurrence.

Counsel for appellant contends that since the city may only occupy the land for a short duration of time after acquiring it, a taking by condemnation cannot be deemed as for public use. That the property may be in public use or ownership for a short duration of time is not consequential. It is the character of the use and not its extent which determines the question of public use. In *Foeller v. Housing Authority of Portland* (1953), 198 Or. 205, 241, 256 Pac. (2d) 752, it was said:

"Accordingly, the fact that the property may not long remain in the ownership of the Housing Authority does not itself indicate that the use will not be public and that the agency may not be invested with the power of eminent domain. It is the use at which the agency will put the property rather than the length of time for which its ownership will be continued."

The fact that the property may not long remain in the ownership of the city does not in itself indicate that the use will not be a public use and that the city may not be invested with the power of eminent domain in acquiring it. In *Zurn v. Chicago* (1945), 389 Ill. 114, 128, 59 N. E. (2d) 18, the court said:

"The fact that the continued use of the property for public purposes, after the elimination of slum and blight areas and the redevelopment of such areas has been achieved, is only partially assured and safeguarded by the act, is wholly immaterial. When such areas have been reclaimed and the re-

development achieved, the public purpose has been fully accomplished. The fact that the act does not thereafter vouchsafe the continued use of the property acquired for public purposes, does not in any way affect the purposes of the act or render the taking of the property a taking for a use or purpose which is not public. The achievement of the redevelopment of slum and blight areas, as defined in the act, in our opinion constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved."

It is not the object of the statute to merely permit the transfer of property from one individual to another. The sale and leasing of the land to private interests is incidental to the accomplishment of the primary purpose. As was said in *Foeller v. Housing Authority of Portland, supra* (p. 236):

"A resale of property in a redevelopment area may lawfully occur only after the housing authority has no more need for the property. A sale at that time is proper, for normally property should not be kept in public ownership but should be restored to the tax rolls when the public has no further need for it. A sale of the property is the final act that takes place concerning the project, if the plan actually calls for a sale, and is in the nature of a winding up of the project. Its purpose is to enable the public treasury to recoup its money. Resales cannot offer private persons opportunities for enrichment or exploitation, for the act declares that property must be sold 'at its fair re-use value' and that 'an authority, upon the sale or lease of such land, shall obligate purchasers or lessees: (1) To use the land for the purpose designated in the redevelopment plan; (2) to begin the building of their improvements within a period of time which the authority fixes as reasonable.' The sale is not the primary purpose of the project, but is only incidental or ancillary to it."

The statute provides that when the objective of blight elimination and subsequent prevention has been accomplished, to wit, the area has been demolished and the plan for redevelopment with assurance of no recurrence exists, the city may effectively transfer such of the land that it does not use.

As was said in *Belovsky v. Redevelopment Authority of Philadelphia* (1947), 357 Pa. 329, 340, 54 Atl. (2d) 277:

"When, therefore, the need for public ownership has terminated, it is proper that the land be retransferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. It is not the object of the statute to transfer property from one individual to another; such transfers . . . are purely incidental to the accomplishment of the real or fundamental purpose."

In *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 203, 60 N. W. (2d) 873, this court said:

"The power to sell lands taken when it is determined that they are no longer needed for public use 'is latent in every taking, and is very different from a taking of land with a contemporaneous knowledge and purpose that a definite and separable part is not necessary for the public use.' "

The fact that incidental private advantages to certain lands are expected to accrue from the construction of the improvement does not derogate from the public nature of the use, if it is constructed for the benefit of the public. Nor does the fact that a by-product of the taking is sold for private use derogate from the public nature of the use. 18 Am. Jur., Eminent Domain, p. 670, sec. 41.

In *Wisconsin River Improvement Co. v. Pier* (1908), 137 Wis. 325, 118 N. W. 857, this court held that where the public use justified the erection of a dam, and the dam, in addition to serving its public purposes, incidentally caused a surplus of water available for power and for private use, the public use was not thereby impaired or destroyed.

Counsel for the respondents here maintain that:

"The transfer by sale or lease, as we have stated before, does not constitute a private use which can defeat the valid operation of the Blighted Area Law. Such sale or transfer, if made to an individual or public entity, is incidental to the

primary purpose of the law, namely, the elimination of slums. However, there may be a transfer to a 'redevelopment company' under sec. 66.43 (6), Wis. Stats. A redevelopment company may mean a 'public corporation or body corporate, including a public housing authority,' under sec. 66.43 (3) (k), Wis. Stats. No matter what transfer is made, whether to a private entity or a public corporation, the use of the land must be 'in accordance with the redevelopment plan' (sec. 66.43 (6), Wis. Stats.). It is apparent that the use of the property after the slums have been eliminated is restricted in accordance with the redevelopment plan by the applicable statutes, and this manifestly extends the public use of the lands acquired no matter who may be the ultimate owner or lessee of such lands."

We find ourselves in accord with such expressed view.

After the city has assembled the property it is given power to sell or lease. The statute obliges that the sale or lease be effectuated upon the basis of restrictions assuring against recurrence of blight in the area. The fact that in the redevelopment plan the city may provide that the property should be sold to persons eligible to buy under the act does not in itself demand a holding that the power of eminent domain may not be employed for the acquisition of property. In *Churchill v. Grants Pass* (1914), 70 Or. 283, 290, 141 Pac. 164, the right to employ the power of eminent domain was sustained notwithstanding the following circumstances:

"The proposition is to build and own a road for the benefit of its citizens. That it may when built lease or sell it does not alter the fact that primarily it is a public improvement for a public purpose."

The appellant also contends that the condemnation of *vacant* land as proposed by the city of Milwaukee will serve no useful purpose.

As to this attack upon the act, we concur with the view expressed by the trial court in its opinion, that:

"Sec. 66.43 (4) (a) 3, Stats., grants to every city the power to acquire, by eminent domain, any real property necessary or incidental to a redevelopment project.

"Sec. 66.43 (3) (i) defines real property to include land.

"Sec. 66.43 (3) (d), Stats., defines land to include 'bare or vacant land.'

"Here again it is to be noted that the law is directed against slum and blighted *areas*, not individual structures. It must be presumed that the legislature believed that the evils resulting from blight are inherent not in the particular structures but in the entire blighted area as a whole. Consider also that the acts of acquisition and clearance are two purposes in the elimination of the blight problem; there remains a third and important purpose—redevelopment of the area, so vitally essential to its return to the community duly safeguarded from the danger of blight recurrence. Redevelopment will involve the vacation of streets and alleys, the relocation of streets, the construction of new streets, probably the construction of recreational facilities, more than likely the enlargement of sites for dwelling houses, replatting, restrictions as to future uses of the lands in the area as well as many other changes. The necessity for acquiring vacant parcels and unoffending buildings within a blighted area to effectuate a sound workable plan of redevelopment is obvious.

"Conceivably a large amount of vacant land and a large number of unoffending buildings could be included in a blighted area as that term is defined by the act. (Sec. 66.43 (3) (j) 1, Stats.) It must be presumed that the legislature by necessity and duty acted with full knowledge of the problem in defining the requirements of a blighted area. Its findings are entitled to deference and respect. It is not difficult to perceive that the framers of this law recognized the fact that vacant lands and unoffending structures are commingled with the offending properties. The act of condemnation is frequently harsh; to condemn unoffending property and later lease or sell it for private use is repugnant to the concept of the fundamental right of private property. It is apparent, however, that to single out and except from the provisions of the law vacant land and unoffending structures would render the whole program of blighted-area redevelopment futile and ineffective. The problem requires more than a halfway meas-

ure. Neither is it to be presumed that those charged with the administration of the law will act unreasonably or arbitrarily."

In *Oliver v. Clairton* (1953), 374 Pa. 333, 342, 98 Atl. (2d) 47, wherein the court sustained the constitutionality of the Pennsylvania Urban Redevelopment Law, the court said:

"Redevelopment authorities have the power, therefore, where the conditions prescribed in the act are found to exist, to exercise the right of eminent domain pursuant to a redevelopment proposal even though the redevelopment area may be predominantly open, vacant, or unimproved."

We consider that the acquisition of property pursuant to provisions of sec. 66.43, Stats., for the purpose of eliminating blighted areas and preventing the spread and recurrence of blight conditions in such areas, the removal of structures and improvement of sites, the sale or leasing of property for redevelopment incidental thereto and with restrictions to prevent recurrence of blight, are for public uses and purposes for which the power of eminent domain may properly be exercised. We find that the statute, sec. 66.43, in these regards does not contravene the constitutional provisions suggested on this appeal. The city of Milwaukee may acquire and assemble areas to carry out the purposes of the statute, and may contract with respect to property acquired under authority of it, and lease or sell such property to private persons or redevelopment corporations in manner as provided by the statute.

We see no need for comment upon the other point raised by appellant in its challenge under the first question presented for our determination.

The second question raised by appellant is: May the city of Milwaukee use its credit or expend tax funds in acquiring blighted areas or portions thereof incidental to the proper

clearance and redevelopment of areas where such blight exists?

Sec. 3, art. VIII, Const., reads: "The credit of the state shall never be given, or loaned, in aid of any individual, association, or corporation."

Appellant again maintains that the redevelopment of a blighted area after its demolition as permitted by the Blighted Area Law, is not for a public use. We have already herein determined that it is clearly for a public use. It is recognized that the powers of eminent domain and taxation are not identical. As was said in *Whiting v. Sheboygan & Fond du Lac R. Co., supra* (p. 191), "These powers [eminent domain and taxation] are not identical, though both must be exercised for a public purpose, or not at all."

The objects for which money is raised by taxation must be public. In *Brodhead v. Milwaukee* (1865), 19 Wis. *624, *652, this court held:

"The objects for which money is raised by taxation must be public, and such as subserve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at the first blush."

Public funds may be expended by the city for a public purpose. However, expenditure of such funds by the city for a private purpose is unconstitutional. *State ex rel. Larson v. Giessel* (1954), 266 Wis. 547, 64 N. W. (2d) 421, citing *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 207, 60 N. W. (2d) 763; *Heimerl v. Ozaukee County* (1949), 256 Wis. 151, 40 N. W. (2d) 564.

By means of the redevelopment plan the city primarily protects itself against the recurrence of blight in affected

areas. In other words, it prevents a repetition of hazard to public health, safety, morals, and general welfare. The legislature may unquestionably grant power to the city, and the city may use its power to develop and maintain a program for the accomplishment of such public purpose and for the expenditure of public money in connection therewith.

The city of Milwaukee may lend its credit for the purposes and uses authorized and specified in sec. 66.43, Stats., it being clear that such purposes and uses are public.

Sec. 3, art. XI of the constitution of Wisconsin expressly recognizes the power of municipal corporations to loan their credit and requires the legislature to restrict it. *Clark v. Janesville* (1859), 10 Wis. *136.

In sec. 66.43, Stats., there is no restriction,—in fact there are positive declarations by the legislature permitting a municipality to appropriate money and to issue bonds in order to carry out the program authorized by the act.

Appellant's counsel argue that the taking of property in a rehabilitated area may include the furnishing of financial assistance. It is not improper for a city to lease or contract for the sale of property, the use of which it does not require for public purposes. The statute contemplates that under the redevelopment plan, contract,—lease or sale,—will include restriction to prevent recurrence of blight in the area.

Counsel for appellant contend that since in the glossary, sec. 66.43 (3) (m), Stats., the state is included as a "public body," and that since sec. 66.43 (13) (a) authorizes any public body to lend or contribute funds to assist any redevelopment project, the state impliedly is authorized to lend its credit in violation of sec. 3, art. VIII, Wisconsin constitution. Sec. 66.43 (13) (a) provides:

"To assist any redevelopment project located in the area in which it is authorized to act, any public body may, upon such terms as it may determine: Furnish services or facilities, provide property, lend or contribute funds, and perform any

other action of a character which it is authorized to perform for other purposes."

It is to be noted that appellant does not challenge the provision in sec. 66.43 (12), Stats., wherein cities may accept grants or other financial assistance from the federal, *state,* and county governments, etc., to carry out the purposes of the law. It seems reasonable that if the state can properly make a grant to the city it may with propriety loan money to the city for the express purposes stated. However, in the event that the state could not properly loan money to the city then, under the very provisions of sec. 66.43 (13), (a), it is limited in the assistance that it may extend, to the authority which it possesses under the law. However, it appears that since a public use exists, the loaning of credit by any body eligible to lend aid, would not be for the assistance of any private person or group.

The defendant, city of Milwaukee, may validly lend its credit and expend tax funds for the purposes and uses authorized and specified in sec. 66.43, Stats.

The appellant by its third question presented on this appeal, challenges the validity of the Blighted Area Law on the ground that it is an unconstitutional delegation of legislative power, in that it contravenes provisions of sec. 1, art. IV, Const., which provides: "The legislative power shall be vested in a senate and assembly."

It is axiomatic that the legislature cannot delegate the power to make laws to any other authority or body. However, the legislature may delegate to an administrative agency the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose of a law which the legislature has enacted. The power of the legislature to delegate authority to administrative agencies is comprehensively treated in *State ex rel. Wisconsin Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 220 N. W. 929,

where Mr. Justice ROSENBERRY, speaking for the court said (p. 505):

"The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,— is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature had laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose, in the language of Chief Justice MARSHALL 'to fill up the details,' in the language of Chief Justice TAFT 'to make public regulations interpreting the statute and directing the details of its execution.' "

Here, by its enactment, the legislature has declared the policy and fixed the standards for the administration of the law. It has made a finding of necessity. It defines blighted area. It gives to cities the responsibility of determining the size of an area to be redeveloped, the costs involved and the details of the redevelopment plan, the method and mechanics of clearance, and the determination of future uses. Obviously, the legislature could not make specific provisions for all of these items, for the very reason that the size, extent, and character of the blighted areas, and the plans for redevelopment, differ in each city where the slum and blight condition exists. The legislature has prescribed general rules and definite standards, but leaves to the city the administration of them. In parallel situation in Oregon, the court, when sustaining the validity of a blight-area redevelopment plan in *Foeller v. Housing Authority of Portland, supra* (p. 267), cited with approval *Opinion to the Governor* (1949), 76 R. I. 249, 262, 69 Atl. (2d) 531, wherein it was said:

" 'We further believe that the act is not objectionable on the ground of improper delegation of legislative power. What shall constitute a blighted area within the meaning of the act is therein described in unmistakable language. The nature

and extent of a blighted area must necessarily vary not only in the different cities and towns but also within the same community. All that the legislature can reasonably do in the circumstances is to prescribe a fixed standard and rules of general application adapted to accomplish the purpose of the act, leaving to the respective local authorities the responsibility of ascertaining as a matter of fact whether there exists in the community a blighted area within the meaning of the act as herein construed that requires redevelopment in the public interests. The determination of that factual question by the municipality is an administrative act and not the exercise of legislative power.' ''

Similar comment is found in *Belovsky v. Redevelopment Authority of Philadelphia* (1947), 357 Pa. 329, 54 Atl. (2d) 277, 172 A. L. R. 953.

By provisions of sec. 66.43, Stats., the legislature fixes with precision the type of tract within the boundaries of a city that may be processed under this law. Clearly, it is to be implied from the act itself, that it is not the intention of the legislature that an area which does not possess the described characteristics shall be dealt with in manner as provided. In its findings the legislature defines with particularity the distinguishing marks or features peculiar to the area that is denominated as blighted. It describes with certainty the type of structures that must exist in an area for the effective application of the law. It defines blighted area as one in which a majority of the existing structures are residential or in which there is a predominance of buildings or improvements, whether residential or nonresidential. It appears to us that the conditions and standards which the legislature has fixed are definite, adequate, and reasonable. A city's redevelopment plan based upon such considerations is valid.

We are obliged to hold that the power conferred upon cities by sec. 66.43, Stats., is not an unconstitutional delegation of power by the legislature.

Counsel appearing as *amici curiae* also have presented a question for our determination herein. It is stated as follows: Does adoption by the Housing Authority of the city of Milwaukee of boundaries of a redevelopment-project area under the provisions of sec. 66.43, Stats., without giving notice of hearings to property owners within the area and without findings upon which it bases its determination as to the boundaries of the project area of "blight" violate the "due process" clause of sec. 1 of the Fourteenth amendment of the United States constitution?

It is contended by counsel that property owners of the particular area project referred to in the complaint were not served with notice of hearing of proceedings before the Housing Authority of the city of Milwaukee in advance of that agency's designation of the boundaries of the project area proposed by it for redevelopment; and that they were afforded no opportunity to be heard with respect to their interests. It is further contended that, to their damage, the property of such owners was designated by the Housing Authority as being blighted, without findings from which appeal can be had.

Counsel challenge the constitutionality of the Blighted Area Law on ground that it denies due process of law by not requiring that the Housing Authority serve notice of hearing upon property owners of an affected area, afford opportunity of hearing, and make findings that can be appealed.

It is to be noted that in the procedural steps provided by the Blighted Area Law there is no provision for notice of hearing before the Housing Authority. Nor is record of the Housing Authority's deliberations or action from which appeal can be taken, required. However, approval of a redevelopment plan by the common council may only be given after public hearing of which notice has been published.

The actions and determinations of the Housing Authority and the common council do not, however, constitute an appropriation of the property of owners in an area designated as blighted, so as to offend against the constitutional provisions that "a state may not deprive a person of . . . property without due process of law." Sec. 1, amendm. XIV, U. S. Const.,

The city authorities merely determine the utility and feasibility of acquisition of property for the public's use as permitted by the statute. The legislature has unlimited power to take private property for public use, or to authorize it to be taken by the city, upon making compensation, reserving, to the property owner the right to contest the question whether the proposed use is a public or private one, and whether the power is to be exercised for the purpose for which it was conferred.

Sec. 66.43, Stats., nowise withholds from property owners of an area designated as blighted, the protections granted to them by ch. 32, Stats. (Eminent Domain). Ch. 32, Stats., requires a jury's determination of the necessity for the taking of property.

In ruling upon a contention such as presented here, the court in *Zurn v. Chicago, supra,* said (pp. 132, 133):

"No such notice to the property owners is necessary to comply with the requirements of due process of law. No property is taken in this proceeding under section 42. The property rights of the landowners are in nowise affected. This is merely another of the steps required by the statute authorizing a redevelopment corporation to exercise the power of eminent domain. After such certificate is issued and suit is filed for the taking of property by the exercise of the power of eminent domain, the court, in such suit, will determine for itself whether or not the steps have been taken and the precedent conditions met by the redevelopment corporation, authorizing it to exercise such power. . . .

"The court, in any condemnation suit instituted by a redevelopment corporation, will determine whether these conditions precedent to the exercise of the right have been complied with. The hearing, therefore, in the suit in which it is sought to acquire property by eminent domain, gives to the property owner the right and the opportunity to be heard upon all questions on which he is entitled to a hearing and fulfils all the requirements of due process of law."

When, for instance, a city considers and determines the development of a public building, or park, it is not obliged to give notice of its deliberations regarding such undertaking, to property owners within the area of the contemplated site. However, when it attempts to acquire such property for such use by eminent domain, the owners of the property are entitled to challenge the necessity of the taking as provided in ch. 32, Stats. The steps required to be taken precedent to the right of the exercise of the power are legislative questions. The question as to whether such steps have been taken is judicial.

The failure of the Blighted Area Law to provide notice of hearing or opportunity to appeal from the determinations of the Housing Authority does not constitute a denial of due process of law.

*By the Court.*—Order affirmed.