DENNIS J. CONTA, Secretary, Department of Revenue
Your predecessor requested my opinion on the constitutionality of the Tax Increment Law created by ch. 105, Laws of 1975.
Under the act the Department of Revenue is charged with certain administrative responsibilities. Subsection (5) (b) of sec. 66.46 of the newly created statute requires the Department to determine and certify the aggregate full value of the taxable property of each taxation district adopting a tax increment financing project. This value constitutes the tax incremental base. Subsection (5) (f) requires the Department to give notice to all governmental entities having the power to levy taxes on property within each district as to both the assessed and equalized value of such property and the assessed and equalized value of the tax increment base.
Your predecessor expressed concern that the law may be unconstitutional, and instructed the staff not to facilitate the creation of tax incremental districts, including the determination and reporting of district values as required by ch. 105, Laws of 1975, until this office has offered your department guidance in meeting its duties under the law.
I. The Tax Incremental Financing Concept.
A. Description of the Tax Increment Law.
Chapter 105, Laws of 1975, creates sec. 66.46 of the statutes and authorizes cities and villages to use tax incremental financing in connection with certain public improvement projects. *Page 195 
Section 1 of the act contains legislative findings that an inequitable situation exists when the cost of public works or improvements within a city or village is borne entirely by the city or village, while the benefit from the expansion of tax base which is stimulated by such improvements extends beyond the city or village into all municipalities which share such tax base. The legislature found that when the cost to a city or village of a public improvement project exceeds the future benefit to the city or village, such socially desirable projects have been postponed or cancelled. The legislature further found that the vital and beneficial public purposes of the following laws were being frustrated because of a lack of incentives and financial resources: the urban redevelopment law, the blighted area law, the blight elimination and slum clearance act, the urban renewal act and the promotion of industry. The legislature went on to declare that the purpose of the act was to create a viable procedure whereby a city or village, through its own initiative and efforts, may finance projects which will tend to accomplish these laudable objectives. Finally, under sec. 1, the legislature found and declared that its establishing a tax increment system was in all respects for the benefit of the people of Wisconsin to serve a public purpose in improving and otherwise promoting their health, safety, welfare and prosperity.
Section 4 of the act contains a further legislative declaration that the act is necessary for the welfare of the state and its inhabitants, and that it is the intent of the legislature that the act be liberally construed to effect its purpose.
Section 3 of the act creates sec. 66.46 of the statutes, the "Tax Increment Law." Subsection (2) of sec. 66.46 contains the definitions of twelve terms under the Tax Increment Law.
Subsection (3) grants powers to cities to create tax incremental districts, to define the boundaries of such districts, to prepare, approve and implement project plans, to issue tax incremental bonds and notes, to deposit money into the special fund of any tax incremental district, and to enter into contracts and agreements to implement project plans. This same grant of power is given to villages under sec. 2 of the act.
Subsection (4) of sec. 66.46 sets forth the steps and plans required to implement the provisions of the Tax Increment Law. *Page 196 
This includes the holding of a public hearing by the planning commission pursuant to proper notice, the recommendation by the planning commission to the local legislative body of the boundaries of a tax incremental district, and the adoption by the local legislative body of a proper resolution which includes,inter alia, a finding that at least 25%, by area, of the real property within such district is either a "blighted area," in need of "rehabilitation or conservation work," or is suitable for "industrial sites" within the meaning of the appropriate statutes; also, a finding that the improvement of such area is likely to enhance significantly the value of substantially all of the other real property in such district. The planning commission must also adopt a project plan for each tax incremental district which must be submitted to and adopted by the local legislative body.
Subsection (5) of sec. 66.46 requires the Department of Revenue to determine the full aggregate value of the taxable property in such district upon application in writing by the city or village clerk. Upon certification by the local clerk such valuation constitutes the tax incremental base of such district as of the date such district was created. The Department of Revenue also is required to give annual notice to the designated finance officer of all governmental entities having the power to levy taxes on property within each tax incremental district as to both the assessed and equalized value of such property and the assessed and equalized value of the tax increment base. This annual notice must explain that the taxes collected in excess of the base will be paid to the city or village, as provided by law.
Subsection (6) describes the allocation of positive tax increments, created when the tax incremental base for any year is less than the equalized value of taxable property in the district. The tax increment is computed by multiplying the total local general property taxes levied on all taxable property within a tax incremental district in any year by a fraction having a numerator equal to that year's equalized value of all taxable property in such district minus the tax incremental base and a denominator equal to that year's equalized value of all taxable property in such district. These positive tax increments for a tax incremental district are allocated to the city or village creating such district until such time that the aggregate project costs are paid, but not later than fifteen years after the last expenditure identified in the plan is made. No *Page 197 
expenditure may be provided for in the plan more than five years after the district is created, unless the plan is amended pursuant to law. All tax increments must be deposited into a special fund and used only to pay project costs for the district, to reimburse the city or village for such payments, or to satisfy claims of holders of tax incremental bonds or notes issued for the district. Under subsec. (7) the district shall terminate when either positive tax increments are no longer allocable, or when dissolved by the local legislative body.
Subsection (9) allows for the financing of project costs in eight different ways, or any combination thereof, one of which is by payment out of the proceeds of the sale of tax incremental bonds or notes issued under the authority and conditions set forth in this subsection.
Subsection (10) allows for the creation of tax incremental districts which overlap one or more existing districts.
Subsection (11) provides that with respect to the county, school districts or any local governmental body having the power to levy taxes on property in a tax incremental district, the calculation of the equalized valuation of taxable property in a tax incremental district under ch. 70 may not exceed the tax incremental base of the district until the district is terminated. An appropriation is made to pay school districts having territory in a tax incremental district all tax increments which have accrued to them each year.
Subsection (13) directs the Department of Local Affairs and Development to report to the governor and legislature as to the social, economic and fiscal impact of such projects.
The act makes an appropriation of $50,000 in fiscal year 1975-76 to the Department of Revenue to provide funding for implementing the Tax Increment Law.
The act also provides for a court test which this office has been unable to pursue in the absence of a real and existing justiciable controversy between parties in interest which this office could represent. No proper foundation for such a test of the act's constitutionality which would allow a court to accept jurisdiction and render a meaningful decision has been laid.
B. Example of tax incremental financing. *Page 198 
Under ch. 70, Stats., counties, school districts and other instrumentalities share in the property taxes collected by cities. Improvements to cities are normally paid for by cities, even though counties, school districts and others share in the expanded tax base created by these improvements. A positive tax increment is the amount of local property tax revenue derived from the increase in value of tax incremental districts as the result of improvements. The Tax Increment Law grants cities (and villages) certain powers to enable them to receive the benefit of the full tax increments until the costs of the improvements giving rise to the increment have been paid.
The Tax Increment Law does not affect the uniform assessment of taxes upon taxpayers. All taxpayers continue to pay property taxes at the same rate upon the equalized value of all property whether located within or outside of the tax incremental districts. The tax increment law simply affects the distribution of some of these taxes assessed and collected by directing their payment for improvements to the tax incremental districts.
Subsection (11) (a) requires a county, school district or other municipalities having the power to levy property taxes to ignore the incremental increase in value in the tax increment district for apportionment purposes.
Assume, for purposes of illustration, that an entire county is composed of four cities, only one of which has a tax incremental district. The equalized values of the property within the four cities are:
 City A $400,000,000 (including increment value) City B 70,000,000 City C 20,000,000 City D 10,000,000 Total ____________ $500,000,000
Assume further that City A has a tax incremental district with a base value of $20,000,000 and an increment value of $30,000,000; the total equalized full market value of the tax increment district being $50,000,000. Finally, assume that the county needs to raise $1,500,000 in property taxes for its budget.
The percentage of the value for each city, excluding the tax increment value as required by subsection (11) (a) would be: *Page 199 
 City A 370,000,000 = .787234 ___________ 470,000,000
 City B 70,000,000 = .148936 __________ 470,000,000
 City C 20,000,000 = .042553 __________ 470,000,000
 City D 10,000,000 = .021277 __________ 470,000,000
The county taxes apportioned to each city would be:
 City A .787234 X 1,500,000 = $1,180,850 City B .148936 X 1,500,000 = 223,405 City C .042553 X 1,500,000 = 63,830 City D .021277 X 1,500,000 = 31,915 __________ $1,500,000
The county mill rate for each city would be:
 City A 1,180,850 = .0031915 _________ 370,000,000
 City B 223,405 = .0031915 _________ 70,000,000
 City C 63,830 = .0031915 _________ 20,000,000
 City D 31,915 = .0031915 _________ 10,000,000
The county taxes collected by each city, determined by applying the mill rate to the total value of all property in each city, including the increment value of the tax incremental district as contemplated by the definition of "tax increment," would be:
 City A .0031915 X 400,000,000 = $1,276,600 City B .0031915 X 70,000,000 = 223,405 City C .0031915 X 20,000,000 = 63,830 City D .0031915 X 10,000,000 = 31,915 _________ $1,595,750
The "tax increment" attributable to the county levy would be the product of the county mill rate times the total equalized value of the tax incremental district times a fraction having a numerator. *Page 200 
of the total equalized value of the tax incremental district minus the tax incremental base and having a denominator of the total equalized value of the tax incremental district, determined as follows:
 (.0031915 x $50,000,000) x ($50,000,000-20,000,000) ______________________ $50,000,000
 $159,575 x 3 = $95,745 __ 5
The amount of taxes needed by the county is $1,500,000. The "tax increment" of $95,745 comes out of the total $1,595,750 taxes collected by the cities for the county, and the following amounts are distributed to the county by each city:
 City A $1,180,850[1]
City B 223,405 City C 63,830 City D 31,915 __________ $1,500,000
Thus, the county has paid $95,745 as its annual share of the cost of the improvements made to the tax incremental district.
II. Presumptions of Constitutionality.
Courts repeatedly have held that the repugnance between a legislative act and the express provisions of the Constitution must be clear and irreconcilable before a statute will be held invalid. Madison Metropolitan Sewerage District v. Committee onWater Pollution (1951), 260 Wis. 229, 253-255, 50 N.W.2d 424;Nebbia v. People of State of New York (1934), 291 U.S. 502, 537,54 S.Ct. 505, 78 L.Ed. 940.
Moreover, in cases where there are two possible constructions of the law, one of which the law would be violative of the Constitution, and the other not, that construction which would save the law must be adopted, even though a different construction would be more obvious or natural. Petition ofBreidenbach *Page 201 
(1934), 214 Wis. 54, 62, 252 N.W. 366. Therefore, the search must be for a means of sustaining the act, not for reasons which might require its condemnation. State ex rel. Thomson v. Giessel
(1953), 265 Wis. 558, 565, 61 N.W.2d 903.
These propositions were restated by the Court in State ex rel.La Follette v. Reuter (1967), 36 Wis.2d 96, 113, 120,153 N.W.2d 49, and in State ex rel. Bowman v. Barczak (1967), 34 Wis.2d 57,69-70, 148 N.W.2d 683, where the court quoted from its decision in Gottlieb v. Milwaukee (1967), 33 Wis.2d 408, 415,147 N.W.2d 633, 637:
 "`All legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law if at all possible. State ex rel. McCormack v. Foley (1962), 18 Wis. (2d) 274, 279, 118 N.W.2d 211; School Dist. v. Marine Nat. Exchange Bank of Milwaukee (1960), 9 Wis. (2d) 400, 403, 101 N.W.2d 112. If any doubt exists it must be resolved in favor of the constitutionality of a statute. State ex rel. Thomson v. Giessel (1953), 265 Wis. 558, 564, 61 N.W.2d 903. We as a court are not concerned with the merits of the legislation under attack. We are not concerned with the wisdom of what the legislature has done. We are judicially concerned only when the statute clearly contravenes some constitutional problem. Chicago N.W. R. Co. v. La Follette (1965), 27 Wis.2d 505, 521, 135 N.W.2d 269.'"
One does not speculate as to possible unconstitutional operation of a statute when there are many areas of permissible constitutional application. State ex rel Bowman v. Barczak,supra.
III. The Uniformity Clause And Equal Protection.
Article VIII, sec. 1, Wis. Const., provides in part that "the rule of taxation shall be uniform."
Uniformity of taxation under Art. VIII, sec. 1, Wis. Const., requires that there be substantial uniformity of rate based on value. Beals v. State (1909), 139 Wis. 544 557, 121 N.W. 347. Once property is selected to be taxed, it must be taxed entirely and the same rate applied to it as to other property in the taxing district. The valuation must be uniform and the rate must be *Page 202 
uniform. Knowlton v. Supervisors of Rock County (1859),9 Wis. *410. The uniformity requirement applies to the assessment or collection of direct taxes on real estate, and not to the distribution of state aids and taxes. Columbia County v.Wisconsin Retirement Fund (1962), 17 Wis.2d 310, 325,116 N.W.2d 142. There is a substantial distinction between an inequality in the assessing or collecting of a tax and the distribution of its proceeds. The former may invalidate the tax and the latter not.State ex rel. Van Dyke v. Cary (1923), 181 Wis. 564, 572,191 N.W. 546. The rule of uniformity does not extend to all steps in enforcing collection of the tax, but does extend to those important steps which are essential parts of the tax proceedings.State ex rel. Owen v. Donald (1915), 161 Wis. 188, 195,153 N.W. 238.
By way of comparison, the Fourteenth Amendment of the United States Constitution does not impose on state taxation a requirement of equality as strict as that in the uniformity clause. Puget Sound Power Light Co. v. King County (1924),264 U.S. 22, 44 S.Ct. 261, 68 L.Ed. 541. Our court has said that Wisconsin's counterpart to the equal protection clause of the federal Constitution is found in Art. I, sec. 1, Wis. Const. Stateex rel. Sonneborn v. Sylvester (1965), 26 Wis.2d 43, 50,132 N.W.2d 249. The equal protection clause is aimed at "invidious discrimination." Unless the statute under consideration touches fundamental interests, legislative classification is valid under the equal protection clause when any reasonable basis may be conceived to justify a statute that appears discriminatory. The burden is upon the challenger attempting to prove the invalidity of the classification. Harper v. Virginia State Board ofElections (1966), 383 U.S. 663, 86 S.Ct. 1079, 1081,16 L.Ed.2d 169; Lehnhausen v. Lake Shore Auto Parts Co. (1973),410 U.S. 356, 93 S.Ct. 1001,35 L.Ed.2d 351.
The Wisconsin Supreme Court expressed the standards for a proper classification in Cayo v. Milwaukee (1969), 41 Wis.2d 643,165 N.W.2d 198, and said at p. 650:
 "`. . . the question whether there is room or necessity for classification is one resting primarily with the legislature, and no court is justified in declaring classification baseless unless it can say without doubt that no one could reasonably conclude that there is any substantial difference justifying different legislative treatment." *Page 203 
Under the provisions of the Tax Increment Law the legislature has imposed a financial obligation upon school districts, counties and other governmental units sharing a tax incremental district as part of its territory to pay for their proportionate share of the expense to make improvements to the tax incremental districts created by cities and villages. The reason they should share in the cost is because they will benefit from the future increase in their tax base. The law provides for the uniform imposition of property taxes within the boundaries of the various taxing jurisdictions which have a tax incremental district within their borders. Within each such jurisdiction a tax is applied at a uniform rate upon all property valued at its equalized full market value. A portion of the taxes collected is for a share of the cost of the improvements. The fact that the "increment value" is not included for apportionment purposes does not affect the uniformity of tax assessment or collection. It simply provides the method whereby the financial obligation is determined to pay for the improvements to the tax incremental district.
The legislature desired to spread the cost of public works or improvements within a city or village to all municipalities which share the tax base which has been expanded by the improvements. The legislature determined this will provide for more equitable financing and encourage desired improvements. The provisions of the law are consistent with those objectives. The legislature has declared that a tax increment system serves a public purpose by improving and otherwise promoting the health, safety, welfare and prosperity of the people of Wisconsin.
The purpose of the Tax Increment Law is also to further carry out the objectives of such public purposes as found in the urban redevelopment law, the blighted area law, the blight elimination and slum clearance act, the urban renewal act and the promotion of industry. Urban renewal itself serves a valid public purpose.David Jeffrey Co. v. Milwaukee (1954), 267 Wis. 559,66 N.W.2d 362; also see 44 A.L.R. 2d 1414, 1420. Similarly, the promotion of industry is for a valid public purpose. State ex rel.Hammermill Paper Co. v. La Plante (1973), 58 Wis.2d 32,205 N.W.2d 784.
Generally, the question of what is a public purpose is for the legislature to decide. In exercising its discretion the courts will not interfere unless its action is clearly unconstitutional. Presumably *Page 204 
legislative enactments are constitutional. State ex rel. Thomsonv. Giessel (1953), 265 Wis. 207, 215, 60 N.W.2d 763. Although the court is not bound by the declaration of public purpose contained in an act, nevertheless what constitutes a public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. State ex rel.Warren v. Reuter (1969), 44 Wis.2d 201, 212, 170 N.W.2d 790.
Some concern has been expressed over the fact that property owners in municipalities of a county, other than the municipality in which a tax incremental district is located, will have to pay a greater share of the county tax as a result of the creation of the tax incremental district. It is true that if the county did not have to contribute toward the cost of the improvements to a tax incremental district, it would have to collect less taxes from its taxpayers. Thus, in our hypothetical, a mill rate of only 3 mills would be needed to raise the $1,500,000 for the county, with each city contributing:
 City A $1,200,000 (.003 x 400,000,000) City B 210,000 (.003 x 70,000,000) City C 60,000 (.003 x 20,000,000) City D 30,000 (.003 x 10,000,000) _______ $1,500,000
Accordingly, the share of taxes of City A would be increased and those of Cities B, C and D decreased, as follows:
 % of county % of county budget under budget without Tax Increment Tax Increment Law Law 
City A .787 .800 City B .149 .140 City C .043 .040 City D .021 .020
This assumes that the improvements and subsequent increments would be made even in the absence of the Tax Increment Law. Since the object of the law is to encourage such improvements, however, it is more logical to assume that the improvements would not have been made in the absence of the law, meaning that there *Page 205 
would be no $30,000,000 tax increment, and leaving City A with a total value of $370,000,000 and the county with a total value of $470,000,000. This latter assumption would result in the payment of the same percentage and same amount of taxes by each city for county purposes determined at the rate of .0031915 established in our hypothetical.
Even under the assumption that the improvements and tax increment would have occurred anyway, it must be remembered that the reason for the other cities having to pay a greater share of the county budget is the result of the legislative declaration that all municipalities (including counties) must share in the cost of the improvements made to their territories in return for the benefits they will receive from an increased property tax base. This does not affect the uniformity of tax assessment or collection, but only the distribution of the taxes after their collection, for a valid purpose, and is not unconstitutional.
The Tax Increment Law, and in particular subsection (11) (a), merely apportions taxes which are levied by the existing taxing districts. The property in the tax incremental district is valued in the same manner and pays the same millage of tax as other property. There is a particular use to which the taxes must be put after their collection, consonant with the valid public purpose of the act, but none of this violates the uniformity rule or the equal protection clause. The law provides that the desired projects will pay for themselves, and the taxing jurisdictions and taxpayers which share in the expanded tax base will all share in the paying for the costs of the improvements. The objects of the legislation have a reasonable basis.
Recently the Supreme Court of Iowa upheld the constitutionality of that state's version of the tax incremental financing concept in the case of Richards v. City of Muscatine (1975),237 N.W.2d 48. On page 60 of that decision reference is made to two Wisconsin cases: Ehrlich v. City of Racine (1965), 26 Wis.2d 352,132 N.W.2d 489, and Gottlieb v. City of Milwaukee (1967),33 Wis.2d 408, 147 N.W.2d 633. Both cases properly prohibit the use of partial exemptions in ad valorem taxation as violating the uniformity clause. The cases are not applicable authority for holding the Tax Increment law invalid, however, because the law does not create partial exemptions. All property owners pay taxes at the same rate upon the equalized value of their property. *Page 206 
The Tax Increment Law on its face does not appear to violate the uniformity clause of Wisconsin's Constitution or the equal protection clause of the United States and Wisconsin Constitutions.
IV. Taxation Without Representation.
The question of "taxation without representation" also is raised by your predecessor's letter of inquiry. Many examples can be cited of "taxation without representation." For instance, a resident of only one county can own property in another county, but he is subject to a county property tax in each county. A taxpayer can reside in one state and earn income in another state, and be taxed by the other state even though he doesn't reside there. Many sales taxes are paid by nonresidents of the taxing authority.
Under the Tax Increment Law the State of Wisconsin, through its elected legislative representatives and its governor, have adopted a law which gives cities and villages additional powers they may exercise. The object of the law is to encourage the cities and villages to exercise these powers to further the statewide public purpose of eliminating blighted areas and encouraging industrial development. To further encourage the cities and villages to utilize their power to effect these public purposes, the legislature has provided the framework within which the powers can be exercised, and further provided that if the power is exercised by the cities and villages, the cost of the improvements must be shared by those who benefit by sharing in the increased tax base caused by the improvements.
The principle of "taxation without representation" does not mean that no one shall be taxed unless he was represented by someone for whom he had an actual opportunity to vote. The following statement from 71 Am. Jur. 2d, State and LocalTaxation, sec. 79, p. 403, is in point:
"Sec. 79. Taxation without representation.
 "The people who pay taxes imposed by laws are entitled to have a voice in the election of those who pass the laws. But this principle, as practically administered, does not mean that no person — man, woman, or child, resident or nonresident — shall be taxed unless he was represented by someone for whom he had an actual opportunity to vote. And although *Page 207 
taxation and representation are indissolubly connected by the underlying principles of free government, payment by a town official of an order drawn on the town treasury by bridge commissioners appointed under a state statute authorizing them to assess the cost of maintaining highways over certain designated bridges against the towns within a certain area may not be refused upon the ground that the money in the treasury is raised by taxation of the residents of the town, who did not elect the commissioners, since the representation of the inhabitants of the town in the legislature which passed the enabling statute is sufficient to satisfy the principle that there shall be no taxation without representation."
V. Conclusion.
There are no facts before me other than the statute itself. Accordingly, my opinion has been limited to the statutory findings and declarations of public purpose made by the legislature, which carry with them a strong presumption of constitutionality.
The Tax Increment Law is presumptively valid, and nothing appears on its face which would prompt me to advise you not to perform the duties and responsibilities it imposes upon the Department of Revenue. Accordingly, it is my opinion that the law should be administered as directed by the legislature.
BCL:APH
[1] Because of some rounding of figures in this example, a nominal $5.00 would be overcollected by City A.