STATE EX REL. HAMMERMILL PAPER COMPANY and another, Petitioners, v. LA PLANTE, Mayor, City of Kaukauna, Respondent.

*No. State 180. Argued January 31, 1973.—Decided April 9, 1973.*
(Also reported in 205 N. W. 2d 784.)

36

38

40

For the petitioners there was a brief by *Maurice J. McSweeney, Richard A. Weiss* and *Richard H. Porter*, attorneys, and *Foley & Lardner* of counsel, all of Milwaukee, and oral argument by *Mr. McSweeney*.

For the respondent there was a brief by *Shea, Hoyt, Greene, Randall, Meissner & Walsh, S. C.*, attorneys, and *William L. Randall* and *Thomas E. Whipp* of counsel, all of Milwaukee, and oral argument by *William L. Randall*.

For the State (intervening pursuant to sec. 274.12 (6), Stats.) the cause was submitted on the brief of *Robert W. Warren*, attorney general, and *Allan P. Hubbard*, assistant attorney general.

CONNOR T. HANSEN, J.   The following issues are presented:

1.  Does the issuance by a municipality of revenue bonds to finance industrial development projects constitute the expenditure of public funds for other than a public purpose?

2.  Is the authorization of a municipality to engage in industrial development projects an unlawful delegation of a matter of statewide interest to a municipality in violation of art. IV, sec. 22, or art. IV, sec. 1 of the constitution?

3.  Does sec. 66.521, Stats., involve the state in works of "internal improvement" in violation of art. VIII, sec. 10 of the constitution?

4.  Does sec. 66.521, Stats., constitute a loan of the state's credit to a private party in violation of art. VIII, sec. 3 of the constitution?

5.  Does the issuance of municipal revenue bonds constitute a state indebtedness for a purpose not authorized by art. VIII, secs. 4 and 7 of the constitution or a

municipal debt in violation of art. XI, sec. 3 of the constitution?

6. Is the lease provision granting Hammermill an option to renew the lease or to purchase the project in violation of sec. 66.521 (3) (c), Stats., or beyond the power of the municipality and in contradiction to art. XI, sec. 3 (a) of the constitution?

7. Is sec. 66.521 (9), Stats., which provides that the tax upon the project property shall not constitute a lien upon the property, in violation of art. VIII, sec. 1 of the constitution, which requires uniformity of taxation?

8. Does the limitation of the benefits of sec. 66.521, Stats., to "industrial enterprises" deny to nonindustrial enterprises the equal protection of laws under art. I, sec. 1 of the Wisconsin Constitution and the fourteenth amendment of the United States Constitution?

9. Does sec. 66.521, Stats., authorize the issuance of bonds for the purchase of pollution abatement equipment?

10. Is the lease between Hammermill and the city in violation of sec. 66.521 (3) (c), Stats., in that the rental reserved therein is insufficient to provide for an adequate depreciation account?

11. Is the provision of the Mortgage And Indenture of Trust permitting Hammermill to purchase the property contingent upon happening of certain events and payment of the bonds from the proceeds of such sale in violation of sec. 66.521 (4) (a), Stats.?

12. Does the provision in the Project Purchase And Financing Agreement authorizing a private placement of the bond issue violate sec. 66.521 (4) (d), Stats.?

13. Is the authority invested in the trustee by the Mortgage And Indenture of Trust an unlawful delegation of municipal authority by the city?

The respondent carries a heavy burden if he is to prevail in his attack upon the constitutionality of sec.

66.521, Stats. It is not enough that respondent establish doubt as to the act's constitutionality nor is it sufficient that respondent establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality. This court has often affirmed the well-established presumption of constitutionality that attaches itself to all legislative acts. In *A B C Auto Sales, Inc. v. Marcus* (1949), 255 Wis. 325, 330, 331, 38 N. W. 2d 708, this court stated:

". . . [T]here are applicable in this case the rules, (1) that the statute is presumed to be constitutional and will be held unconstitutional only if it appears so beyond a reasonable doubt. *Payne v. Racine,* 217 Wis. 550, 561, 562, 259 N. W. 437; *Gibson Auto Co. v. Finnegan,* 217 Wis. 401, 412, 413, 259 N. W. 420; *Petition of Breidenbach,* 214 Wis. 54, 60, 252 N. W. 366; and (2) that the burden of establishing the unconstitutionality of a statute is on the person attacking it, who must overcome the strong presumption in favor of its validity. 11 Am. Jur., Constitutional Law, p. 795, sec. 132.
"As stated in *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 160, 189 N. W. 564:
" 'If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court.'
"And as stated in *Gibson Auto Co. v. Finnegan, supra* (p. 406) :
" '. . . under our system of government the court is not called upon to consider the economic, social, and political matters dealt with in the act. Whatever conclusion may be reached as the result of our deliberation, it in no way involves the determination by the court of the social value of the objectives sought. Under our

constitutional system, in reviewing an act of the legislature, the duties of the court are limited to considering whether or not the act of the legislature contravenes the provisions of the constitution.' "

Also, in *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 415, 147 N. W. 2d 633, this court said:

"On the other hand, it is a legislative enactment that is attacked as being unconstitutional, and the cardinal rule of statutory construction is to preserve a statute and to find it constitutional if it is at all possible to do so. We have recently said:

" '. . . the duty of this court is . . . if possible, to so construe the statute as to find it in harmony with accepted constitutional principles.' *State ex rel. Harvey v. Morgan* (1966), 30 Wis. (2d) 1, 13, 139 N. W. (2d) 585.

"All legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law if at all possible. *State ex rel. McCormack v. Foley* (1962), 18 Wis. (2d) 274, 279, 118 N. W. (2d) 211; *School Dist. v. Marine Nat. Exchange Bank* (1960), 9 Wis. (2d) 400, 403, 101 N. W. (2d) 112. If any doubt exists it must be resolved in favor of the constitutionality of a statute. *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 564, 61 N. W. (2d) 903. We as a court are not concerned with the merits of the legislation under attack. We are not concerned with the wisdom of what the legislature has done. We are judicially concerned only when the statute clearly contravenes some constitutional provision. *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. (2d) 505, 521, 135 N. W. (2d) 269."

Therefore, in order for this court to strike down an act of the legislature, it is necessary to find that it offends specific provisions of the state constitution which have limited and circumscribed legislative action.

*Public purpose.*

No specific clause in the constitution establishes the public purpose doctrine. However, it is a well-established

constitutional tenet. *State ex rel. Singer v. Boos* (1969), 44 Wis. 2d 374, 171 N. W. 2d 307; *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 170 N. W. 2d 790; *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 153 N. W. 2d 49; *State ex rel. Bowman v. Barczak* (1967), 34 Wis. 2d 57, 148 N. W. 2d 683. In *State ex rel. Singer v. Boos, supra,* page 381, this court stated:

"Although there is no specific constitutional clause so stating, the rule is firmly established that there can be no expenditure of public funds for a private purpose."

Both parties on this appeal concede that public funds may be expended only for public purposes, and that the expenditure of such funds for a private purpose is unconstitutional.

What constitutes a public purpose is in the first instance a question for the legislature to determine. This court in *State ex rel. La Follette v. Reuter, supra,* at pages 114 and 115, stated:

"The rule for determining the public purpose for expenditure of public funds is set forth in *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 207, 215, 216, 60 N. W. 2d 763:

" 'The general rule as to the public purpose of the expenditure of public funds is stated in 81 C. J. S., States, p. 1149, sec. 133, as follows:

" ' "Generally, in connection with the validity of the expenditure of state funds, what is . . . a public purpose, is a question for the legislature to decide, with respect to which it is vested with a large discretion, which cannot be controlled by the courts unless its action is clearly evasive. . . . Where a doubt exists whether the purpose of an appropriation is public or private, it will be resolved in favor of the validity of the appropriation, . . . " ' '

"The *Thomson Case* (1953), *supra,* at page 216, cited with approval, *Carmichael v. Southern Coal & Coke Co.* (1937), 301 U. S. 495, 57 Sup. Ct. 868, 81 L. Ed. 1245, which states:

" ' ". . . The existence of *local conditions* which, because of their nature and extent, are of concern to the public as a whole, the *modes of advancing the public interest* by correcting them or avoiding their consequences, *are peculiarly within the knowledge of the legislature,* and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods. [Citations.] As with expenditures for the general welfare of the United States [Citations], *whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court.* [Citations.] " ' " [2]

The legislature's declaration of public need and public purpose is expressed in sec. 66.521 (1), Stats.:

". . . It is found and declared that industries located in this state have been induced to move their operations in whole or in part to, or to expand their operations in, other states to the detriment of state, county and municipal revenue raising through the loss or reduction of income taxes, real estate and other local taxes, and thereby causing an increase in unemployment; that such conditions now exist in certain areas of the state and may well arise in other areas; that economic insecurity due to unemployment is a serious menace to the general welfare of not only the people of the affected areas but of the people of the entire state; that unemployment results in obligations to grant public assistance and in the payment of unemployment compensation; that the absence of new economic opportunities has caused workers and their families to migrate elsewhere to find work and establish homes, which has resulted in a reduction of the tax base of counties, cities and other local governmental jurisdictions impairing their financial ability to support education and other local governmental services; that security against unemployment and the preservation and enhancement of the tax base can best be provided by the promotion, attraction, stimulation, rehabilitation and revitalization of commerce, industry

[2] In accord: *State ex rel. Singer v. Boos, supra,* at page 381.

and manufacturing; that there is a need to stimulate a larger flow of private investment funds from banks, investment houses, insurance companies and other financial institutions. It is therefore declared to be the policy of this state to promote the right to gainful employment, business opportunities and general welfare of the inhabitants thereof and to preserve and enhance the tax base by authorizing municipalities to acquire industrial buildings and to finance such acquisition through the issuance of revenue bonds for the purpose of fulfilling the aims of this section and such purposes are hereby declared to be public purposes for which public money may be spent and the necessity in the public interest for the provisions herein enacted is declared a matter of legislative determination."

This court will give great weight and afford very wide discretion to legislative declarations of public purpose. However, this court is not bound by legislative expressions of public purpose. While what is for the public good and what are public purposes are questions for the legislature to decide upon its own judgment, it is this court's constitutional burden to examine such legislation and not to accept, without study, legislative expressions of public need or purpose. This court, addressing itself to a similar declaration of public purpose contained in sec. 59.071, Stats., in *State ex rel. Bowman v. Barczak, supra,* at pages 65 and 66, stated:

"As noted in *State ex rel. Wisconsin Development Authority v. Dammann,* quoted above, 'a very wide discretion' is given to the legislature regarding its pronouncement as to public purpose. In that case this court also indicated judicial reluctance to intrude when the enactment does not appear 'at first blush' to be for a private purpose. Nevertheless, the constitutional question remains as to how far a court should go in deferring to the conclusions of the legislature. We fully recognize that 'the hierarchy of community values is best determined by the will of the electorate' and that 'legislative decisions are more representative of popular opinion because individuals have greater access to their legislative representatives.' See Note, The 'Public Pur-

pose' of Municipal Financing for Industrial Development, 70 Yale Law Journal (1960–1961), 789, 797.

"Nevertheless, when legislation is challenged, the justices of this court deem it their unavoidable burden under the constitution to examine such legislation and to assess its realistic operation. Although the legislative declarations are entitled to great weight, we may not blindly accept at full value even the most elaborate prefatory expressions concerning community need, economic impact, or public purpose. *David Jeffrey Co. v. Milwaukee* (1954), 267 Wis. 559, 578, 66 N. W. (2d) 362." [3]

In *Allardice v. Adams County* (1970), 173 Colo. 133, 147, 476 Pac. 2d 982, the Colorado Supreme Court was considering a legislative enactment somewhat analogous to sec. 66.521, Stats., and expressed the court's role in the determination of public purpose in the following manner:

"Although the expressed intent of the legislature has no magical quality which validates the invalid, it is entitled to reverent weight in determining whether the Act promotes a public purpose. It has been appropriately said, the inquiry into the validity of an Act of the legislature is an inquiry whether the will of the people as expressed in the law is or is not in conflict with the will of the people, as expressed in the constitution; and unless it be clear that the legislature has transcended its authority, the courts will not interfere. Every presumption in favor of the validity of questioned legislation is indulged in by courts in testing its constitutionality. . . ."

In *State ex rel. Bowman v. Barczak, supra,* this court, in light of the legislative declaration of public purpose and in the absence of operational facts demonstrating otherwise, held that sec. 59.071, Stats., an industrial development law somewhat similar to the act presently under consideration, was constitutional upon its face. This court decided that the provisions of sec. 59.071, constituted a valid declaration of public purpose.[4]

---

[3] *See: State ex rel. Warren v. Reuter, supra,* page 212.

[4] *State ex rel. Bowman v. Barczak, supra,* page 69.

Respondent argues that the operational facts, in the instant case, demonstrate a direct and immediate advantage to Hammermill as a private individual and that any advantage to the public is indirect and conjectural. Hammermill's debt service cost incident to construction and improvement of its building and facilities, as a result of the anticipated tax exemption [5] on the interest earned from the bonds, will be substantially minimized and Hammermill, upon expiration of the lease, has the option to renew the lease or purchase the project at a minimal price. Respondent concludes that the facts give rise to a strong "suspicion" that private benefit is the primary and certain result of sec. 66.521, Stats.

Hammermill characterizes the benefits running to the company as "incidental" to public benefits that will accrue to the city. Hammermill argues that without such a program it and other companies in similar situations could be forced to shut down and that such an action would necessarily imperil the municipality's tax base and the economic opportunity of its citizens. It argues that such programs are necessary to attract new and preserve existing industries during a time in which industry is extremely mobile and there is considerable competition among states to attract industry, Hammermill notes that in return for the benefits flowing to the city, the city will expend no public funds or tax moneys and risk neither its assets nor its revenues.

In an affidavit filed on behalf of the petitioners, William C. Kidd, secretary of the department of business development of the state of Wisconsin, states that the availability of industrial development bond financing, such as that authorized by sec. 66.521, Stats., is a significant and possibly a deciding factor in many em-

[5] It appears that under a past ruling, the Internal Revenue Service has construed the Internal Revenue Code so as to grant a tax exemption to income derived from municipal bonds.

ployer's decisions regarding where to locate new industrial enterprises; that the state of Wisconsin has suffered in its competition with other states for employers; that employers, having an aggregate of over $100,000,000 in projects, currently desire to use sec. 66.521 bond financing; and that sec. 66.521 would place Wisconsin employers on a par with those of their out-of-state competitors who do have available this method of financing.[6]

Other jurisdictions have dealt with the problem of public purpose in connection with industrial development acts comparable to sec. 66.521, Stats. While a few have determined such acts as unconstitutional the great majority have upheld such acts against attacks as to public purpose.[7] In *Faulconer v. City of Danville, supra,* at pages 471–473, it is stated:

[6] Based upon the United States Chamber of Commerce estimate prepared for the small business administration, the Michigan Supreme Court in *City of Gaylord v. City Clerk* (1966), 378 Mich. 273, 296, 144 N. W. 2d 460, 468, finding public purpose in a similar statute, noted the following predicted impact of a manufacturing plant on the economy of a municipality:

" 'Chart

" 'What Each 100 Jobs Means to a Community.
" 'What 100 New Factory Workers Bring to a Town:
  " '359 More People
  " '91 More School Children
" '$710,000 More Personal Income Per Year
  " '100 More Households
" '$229,000 More Bank Deposits
  " '3 More Retail Establishments
  " '97 More Passenger Cars Registered
  " '65 More Employed in Nonmanufacturing
" '$331,000 More Retail Sales Per Year.' "

[7] Among the decisions supporting the public purpose of such legislation, the following have been considered: *Allardice v. Adams County, supra; Roan v. Connecticut Industrial Building Comm.* (1963), 150 Conn. 333, 189 Atl. 2d 399; *Green v. City of*

"In enacting the statute under which the present venture is undertaken, the legislature deemed the acquisition and ownership by a city of an 'industrial building' to be a public project. The legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest or welfare and to be without the scope of legitimate government. The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am. Jur., Municipal Corporations, Sec. 132. It reaches perhaps its broadest extent under the view that economic welfare is one of the main concerns of the city, state and the federal governments. This is manifested by the great bulk of recent social security programs of the nation and the state. Of special pertinence are those providing for unemployment insurance and security, thus decreasing what the Tennessee Supreme Court calls 'unemployment's twin offspring, hunger and crime.' Azbill v. Lexington Manufacturing Co., Tenn. Sup., 221 S. W. 2d 522, 524. With reference to this concern of government, Mr. Justice Stone, later Chief Justice, writing for the Supreme Court, in holding constitutional an Alabama statute levying taxes and providing for their use, said: 'The evils of the attendant social and economic wastage permeate the entire social structure. Apart from poverty, or a less extreme impairment of the savings which afford

Mt. Pleasant (1964), 256 Iowa 1184, 131 N. W. 2d 5; Faulconer v. City of Danville (1950), 313 Ky. 468, 232 S. W. 2d 80; Opinion of the Justices (1965), 161 Me. 182, 210 Atl. 2d 683; City of Gaylord v. City Clerk, supra; City of Pipestone v. Madsen (1970), 287 Minn. 357, 178 N. W. 2d 594; Fickes v. Missoula County (1970), 155 Mont. 258, 470 Pac. 2d 287; Carruthers v. Port of Astoria (1968), 249 Ore. 329, 438 Pac. 2d 725; Elliott v. McNair (1967), 250 S. C. 75, 156 S. E. 2d 421; Clem v. City of Yankton (1968), 83 S. D. 386, 160 N. W. 2d 125; Reed v. City of Cheyenne (Wyo. 1967), 429 Pac. 2d 69;

Contra: State v. Town of North Miami (Fla. 1952), 59 So. 2d 779; Village of Moyie Springs v. Aurora Mfg. Co. (1960), 82 Idaho 337, 353 Pac. 2d 767; State ex rel. Beck v. City of York (1957), 164 Neb. 223, 82 N. W. 2d 269; Mitchell v. Financing Authority (1968), 273 N. C. 137, 159 S. E. 2d 745.

the chief protection to the working class against old age and the hazards of illness, a matter of inestimable consequence to society as a whole, and apart from the loss of purchasing power, the legislature could have concluded that unemployment brings in its wake increase in vagrancy and crimes against property, reduction in the number of marriages, deterioration of family life, decline in the birth rate, increase in illegitimate births, impairment of the health of the unemployed and their families and malnutrition of their children.' Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 875, 81 L. Ed. 1245, 109 A. L. R. 1327. . . .

"All these social security enterprises—including low-cost housing, old age insurance and special care of the blind and needy children—all, are illustrative of the modern concept of public purpose. They are in their nature preventive of consequences always recognized as subjects and objects of public concern."

However, the ultimate decision in this case rests upon the provisions of the Wisconsin Constitution and judicial precedent.

The concept of public purpose has experienced steady growth under the decisions of this court. In *State ex rel. Bowman v. Barczak, supra,* industrial development through the creation of separate county agencies and bond issues, pursuant to sec. 59.071, Stats., was determined to be a valid constitutional enactment as it related to a declaration of public purpose. In *West Allis v. Milwaukee County* (1968), 39 Wis. 2d 356, 159 N. W. 2d 36, construction of incinerators and waste disposal facilities was considered a public purpose. In *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 170 N. W. 2d 790, financial aid to Marquette School of Medicine, a private nonprofit corporation, was upheld upon the premise that public health is a public purpose.

Public purpose is not a static concept. The trend of both legislative enactments and judicial decisions is to extend the concept of public purposes in considering the demands upon municipal governments to provide for the

needs of the citizens. 2 McQuillin, *Municipal Corporations* (3d ed., rev. 1966), pp. 817, 818, sec. 10.31. This court in *State ex rel. Bowman v. Barczak, supra,* pp. 64 and 65, stated:

" '. . . It is to be observed that the tendency of later cases is toward greater liberality in characterizing taxes or appropriations as public in purpose, doubtless in recognition of the fact, as was stated in *Laughlin v. City of Portland, supra,* that:

" ' "Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual efforts may vary. . . . On the one hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. . . . Its two tests are: First, the subject matter, or commodity, must be one of 'public necessity, convenience or welfare.' . . . The second test is the difficulty which individuals have in providing it for themselves." ' "

A court can conclude that no public purpose exists only if it is "clear and palpable" that there can be no benefit to the public. *West Allis v. Milwaukee County, supra,* page 377. The determination of what constitutes public purpose is primarily a function of the legislative body and as such will not be overruled by this court upon review, except in instances where that determination is "manifestly arbitrary or unreasonable." *David Jeffrey Co. v. Milwaukee* (1954), 267 Wis. 559, 579, 66 N. W. 2d 362.

In the instant case, the declaration of purpose enunciated by the legislative enactment, supported by the affidavit of Mr. Kidd, demonstrates that industrial revenue bond projects provided for and authorized by sec. 66.521, Stats., will promote the general welfare of this state.[8]

[8] The protection of economic interests of the general public falls within the scope of promotion of the general welfare, and thereby affords a basis for the exercise of the police power. *State v. Eau Claire Oil Co.* (1967), 35 Wis. 2d 724, 732, 151 N. W. 2d 634; *State ex rel. Miller v. Manders* (1957), 2 Wis. 2d 365, 371, 86 N. W. 2d 469.

The development of such programs will also place Wisconsin upon a competitive basis with neighboring states that heretofore have approved similar legislation.[9]

Based upon the facts, as stipulated between the parties, and the consideration we have given to the enabling legislation, sec. 66.521, Stats., and the project, as promulgated by the city, are declared constitutional as evidencing a public purpose.

### *Unlawful delegation of a matter of statewide interest to a municipality.*

Art. IV, sec. 22 of the Wisconsin Constitution, provides:

"The legislature may confer upon the board of supervisors of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe."

In *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 53 N. W. 2d 514, 55 N. W. 2d 40, the foregoing section of the constitution was interpreted to mean that the state may only delegate to county boards powers of local character, and may not delegate powers over matters of statewide concern. Where doubt exists as to whether the power delegated is of local or statewide concern the question is to be resolved by the balancing of interests to determine whether the state or local interest is "paramount." In *Muench, supra,* this court declared unconstitutional a statute which permitted counties to authorize the construction of dams. Such power was determined to conflict with the "paramount" interest of the state in its navigable waters and the interests of the people of the entire state in the activities

---

[9] *See: People ex rel. City of Salem v. McMackin* (Dec. 1, 1972), 53 Ill. 2d 347, 291 N. E. 807; *Green v. City of Mt. Pleasant* (Iowa 1964), *supra; City of Gaylord v. City Clerk* (Mich. 1966), *supra; City of Pipestone v. Madsen* (Minn. 1970), *supra.*

of fishing, hunting, and the enjoyment of natural scenic beauty.

Although art. IV, sec. 22 relates solely to counties and sec. 66.521 (2) (a), Stats., defines "municipality" as a city, village or town, nevertheless, the principles enunciated in *Muench, supra,* have been held to be applicable to cities. *Fond du Lac v. Empire* (1956), 273 Wis. 333, 337, 77 N. W. 2d 699.

Other pertinent provisions of the constitution are:
Art. IV, sec. 1:

"The legislative power shall be vested in a senate and assembly."

Art. XI, sec. 3:

"Cities and villages organized pursuant to state law are hereby empowered, to determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of state-wide concern as shall with uniformity affect every city or every village. The method of such determination shall be prescribed by the legislature. . . . Any county, city, town, village, school district, or other municipal corporation incurring any indebtedness as aforesaid, shall before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same; . . ."

While art. XI, sec. 3 has been construed to be a direct grant of power to cities and villages, it does not give to the legislature any power to delegate legislative authority to cities or villages in matters primarily of statewide concern. *Fond du Lac v. Empire, supra.*

Respondent argues that the legislature, through sec. 66.521, Stats., has delegated to cities, villages and towns, authority over matters of statewide concern.

In *Menzer v. Elkhart Lake* (1971), 51 Wis. 2d 70, 78, 186 N. W. 2d 290, this court stated:

". . . We see a distinction between assigning a right to block advancement of paramount interests, and the delegation of a limited authority or responsibility to further proper public interests. The purpose of the delegation as well as the area of concern in which it is made appear relevant and material on the issue of whether delegation of state authority to local municipalities is proper or permissible."

Similarly, in *Johnston v. Sheboygan* (1966), 30 Wis. 2d 179, 184, 140 N. W. 2d 247, this court, quoting *Milwaukee v. Childs Co.* (1928), 195 Wis. 148, 151, 217 N. W. 703, stated:

" '. . . municipalities may enact ordinances in the same field and on the same subject covered by state legislation where such ordinances do not conflict with, but rather complement, the state legislation.' "

In this case at bar we find no potential conflict between state and local rights; therefore, there is no need to engage in a balancing of interests to determine whether the state interest or the local interest is paramount. *State ex rel. Bowman v. Barczak, supra,* at page 74. Sec. 66.521, Stats., does not constitute an unlawful delegation of a matter of statewide interest to a municipality.

*Internal improvement.*

Art. VIII, sec. 10 of the constitution, provides, in part:

"The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; . . ."

This court has consistently held that the internal improvement provision of the constitution applies only to works engaged in by the state and is not applicable to activities carried on by a governmental subdivision of

the state.[10] In *State ex rel. Bowman v. Barczak, supra,* this court stated at page 73:

"The relator also claims that the Industrial Development Law violates sec. 10, art. VIII of the Wisconsin constitution in that it permits works of internal improvement. This contention fails because this court has frequently held that the internal improvement provision applies only to works engaged in by the state; it is not applicable to activities carried on by a governmental subdivision of the state. See *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 206, 60 N. W. (2d) 873. In

[10] Pollution of waters and abatement facilities are matters of great public concern. In *Norway v. State Board of Health* (1966), 32 Wis. 2d 362, 370, 145 N. W. 2d 790, this court said: ". . . The pollution of public waters is a matter of great public concern and inimical to public health. . . ."

However, this court in *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 401, 147 N. W. 2d 304, defined "internal improvement" in the following manner:

" 'In *Rippe v. Becker,* 56 Minn. 100, 117, 57 N. W. 331, the precise question we now have under consideration was carefully considered. As we have heretofore said the result there was fully approved here. The opinion of the court, written by MITCHELL, J., is well abridged, as to the principle declared, in the syllabus:

" ' " " 'Works of internal improvement,' as used in the constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in performance of its governmental functions such as a state capitol, state university, penitentiaries, reformatories, asylums, quarantine buildings, and the like, for the purposes of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other like recognized functions of state government." '

"The foregoing definition of internal improvement was approved and adopted by this court in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 343, 65 N. W. (2d) 529."

The court concluded, at page 403, that:

". . . matters pertaining to the abatement of water pollution are governmental functions of the state of Wisconsin and that water pollution prevention and abatement facilities are not works of internal improvement within the prohibition of sec. 10, art. VIII, Const."

*Redevelopment Authority v. Canepa* (1959), 7 Wis. (2d) 643, 651, 97 N. W. (2d) 695, we said:

" 'It has been held from almost the beginning of the state that while the state is subject to the prohibitions . . . [against] carrying on of works of internal improvement, governmental units created by the state and carrying on their public functions in particular localities or geographical subdivisions of the state are not so subject. *Bushnell v. Beloit* (1860), 10 Wis. \*195; *Clark v. Janesville* (1859), 10 Wis. \*136; *Jensen v. Board of Supervisors* (1879), 47 Wis. 298, 2 N. W. 320.' "

The respondent further contends that a municipality should not be able to participate in "works" in which the state is constitutionally prohibited from participation. This argument was repudiated early in the history of this state. In *Clark v. City of Janesville* (1859), 10 Wis. 119 (\*136), 131–133, Mr. Justice PAINE, writing for this court, stated:

". . . A city is not the state, neither is a town or county. The question then is, whether they are within the spirit of the provision? And it seems to me beyond doubt, that they are not. . . .

". . .

"The object of the prohibition in section 10 against the state contracting debt for works of internal improvement . . . does not require cities, counties and towns, to be included in the prohibition. The simple reason is, the object was only to prevent the state as a state, from becoming a party to such works, and not to prohibit the works from being carried on. . . ."

Sec. 66.521, Stats., does not make the state a participant in works of internal improvement.

*Credit of the state loaned.*

Art. VIII, sec. 3 of the constitution provides:

"The credit of the state shall never be given, or loaned, in aid of any individual, association or corporation."

Sec. 66.521, Stats., expressly limits the authority to issue bonds to finance industrial improvements to a "municipality." Sec. 66.521 (2) (a), defines a municipality to be "any city, village or town in this state." The statute grants no authority to the state to issue bonds of this type. This court, in *State ex rel. La Follette v. Reuter, supra,* 33 Wis. 2d at page 398, said:

"In *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 197, 277 N. W. 278, 280 N. W. 698, this court stated as follows:

" 'It is our conclusion that the giving or loaning of the credit of the state which it was intended to prohibit by sec. 3, art. VIII, Wis. Const., occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party. . . .'

"There is no loaning of state credit (contrary to sec. 3, art. VIII, Const.) unless the state becomes legally obligated for a debt."

There is no loan of credit of the state in the instant proceeding. Sec. 66.521, Stats., cannot be construed as the authorization of any legally enforceable obligation against the state. Therefore, sec. 66.521 does not conflict with art. VIII, sec. 3 of the constitution.[11]

The credit of the city is not the credit of the state and, as previously stated, the acts of the municipality are not subject to the objection that the state is indirectly doing through the city what it cannot do directly.[12] *Clark v. City of Janesville, supra,* page 133.

---

[11] *State ex rel. Bowman v. Barczak, supra; State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 72 N. W. 2d 577; *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. 2d 873.

[12] For decisions of other state courts construing their constitutions differently and holding the acts of a municipality subject to such an attack, *see: Village of Moyie Springs v. Aurora Mfg. Co.* (Idaho 1960), *supra; State ex rel. Beck v. City of York* (Neb. 1957), *supra; Elliott v. McNair* (S. C. 1967), *supra.*

*State or city indebtedness.*

Respondent contends that sec. 66.521, Stats., and the Hammermill project creates state and municipal debt in excess of and contrary to the constitutional limits contained within art. VIII, sec. 4, and art. XI, sec. 3 of the constitution.

Respondent concedes that no provision in sec. 66.521, Stats., creates a legally enforceable debt against the state but again argues that the state cannot do indirectly, through the use of its governmental subdivisions, that which it is prohibited from doing directly. What has been previously determined is applicable here. Debt of a municipality is not the debt of the state. Sec. 66.521 does not authorize the state to contract a public debt, and therefore does not violate the provisions of art. VIII, sec. 4 of the constitution.

Art. XI, sec. 3, sets constitutional limits upon municipal debt, and further provides:

". . . Any county, city, town, village, school district, or other municipal corporation incurring any indebtedness as aforesaid, shall before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same. . . ."

Art. XI, sec. 3, continues with exceptions not pertinent to the instant case and concludes:

". . . An indebtedness created for the purpose of purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility of a town, village, city or special district, and secured solely by the property or income of such public utility, and whereby no municipal liability is created, shall not be considered an indebtedness of such town, village, city or special district, and

shall not be included in arriving at such debt limitation.
. . ." [13]

Respondent argues that the project envisioned by the city, pursuant to sec. 66.521, Stats., violates art. XI, sec. 3 in that it does not provide for a direct annual tax sufficient to pay the interest of the "debt" created.

Sec. 66.521 (4) (a), Stats., expressly negates the municipality's authority to create an indebtedness within the meaning of any state constitutional or statutory limitation. The bonds shall not constitute nor give use to a pecuniary liability of the municipality or a charge against its general credit or taxing powers. The principal and interest of the bonds shall be payable solely out of the revenues to be derived from the lease of the project. Sec. 66.521 (5) (a) provides that the bonds may be secured by a pledge of the revenues out of which the bonds are payable and by a mortgage on the project from which the revenues so pledged may be derived. The agreement between Hammermill and the city contains both a pledge of the revenues and mortgage upon the project property. The project is subjected to a purchase-money mortgage lien, which the city does not assume to pay by resorting to its taxing powers or to its property or funds.

Respondent contends that these factors give rise to a legally enforceable obligation of the city which is tantamount to a debt. Respondent argues that there is no constitutional authority for extending the purchase-money mortgage exception from municipal debt restrictions, now available to municipal utilities only, to the original acquisition by the city of the instant project; that the mortgage on the project property creates a lien on property owned by the city; and that the lienholders have the right to foreclose the mortgage in the event of a default. Respondent concludes that the city has created

---

[13] The last sentence of art. XI, sec. 3, was created by a 1932 amendment.

"debt" in excess of art. XI, sec. 3 of the constitution, in that it has pledged its interest in public property.

When no funds or property acquired by taxation are involved, and the mortgage is payable solely out of the revenues of the project, the giving of a mortgage upon the property so acquired from the proceeds of the bonds to be sold does not make the bonds "debts" of the city within the meaning of art. XI, sec. 3.

A clear statement of the rule is found in Annot. (1931), *Municipal Debt Limit—Pledge of Income*, 72 A. L. R. 687, 701:

". . . [T]he great weight of authority supports the view that the purchase of property does not give rise to an indebtedness or liability within the meaning of a constitutional or statutory debt limitation, where the purchase price is payable exclusively from income or profits to be derived from the property purchased. . . .

". . . Where, however, a mortgage is imposed on *property already owned* by the municipality, or upon other property in addition to that purchased, to secure the purchase price, there is an indebtedness or liability, within the meaning of the debt limitation. . . . *But according to the weight of authority, this rule does not apply where the mortgage or vendor's lien attaches only to the property purchased.* . . ." (Emphasis supplied.)

The previous decisions of this court are in accord with the majority. Prior to the 1932 amendment to art. XI, sec. 3 of the constitution, which excepted public utility debt from the constitutional debt limitations, this court in *State ex rel. Morgan v. Portage* (1921), 174 Wis. 588, 184 N. W. 376, considered the question whether city compliance with 927-16, Stats. 1919, constituted "debt" under art. XI, sec. 3. The statute provided for the purchase, construction or acquisition of public utilities. Sub. (11) provided, in part:

". . . there shall be and there is hereby granted and created a statutory mortgage lien upon the public utility so purchased, constructed or acquired to and in favor

of the holders of said bonds . . . and the coupons of said bonds."

The statute further provided that in the case of default in payment of the bonds the lien may be enforced and the utility sold at auction. At pages 591 and 592, this court stated:

". . . In substance the statute provides for the creation of a purchase-money lien on the utility and the application of the revenue it produces for the payment of the expense of its operation, depreciation, and the cost of acquisition or construction. The effect of the scheme is to subject the utility to a purchase-money mortgage lien, which the city does not assume to pay by resorting to its taxing power or to its property or funds. The city assumes no financial obligation, but contracts to perform the duty of managing the revenues of the utility for the benefit of the purchase-money lienors, and if the utility pays for itself in the manner provided by the statute then the municipality is to become the owner of the utility. In speaking of the significance of the word 'debt' as used in sec. 3, art. XI, of the constitution, this court said in *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018:

" 'It means "something owed;" "money due or to become due upon express or implied agreement." . . . It denotes not only an obligation of the debtor to pay, but the right of the creditor to receive and enforce payment. (Citing.) Under the constitution as well as under the law of taxation the question is: Is the city indebted?'

"The court held in that case that contracts for the purchase of park land under statutes authorizing such purchases, upon terms 'creating a lien thereon for such purchase money, without creating any corporate liability therefor, do not constitute a city indebtedness within the constitutional limitation restricting city indebtedness.' "

*State ex rel. Morgan v. Portage, supra,* pages 593, 594, establishes a distinction between a mortgage upon property *to be acquired* and a mortgage on property *already owned* by the city. In the instant case, we are concerned with property to be acquired by the city.

The effect of a lien on property as security for a revenue obligation was further considered by this court in *State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. 2d 529; *Morris v. Ellis* (1936), 221 Wis. 307, 266 N. W. 921.

Where the purchase price for property to be acquired by a municipality is payable exclusively from income or profits to be derived from the property purchased and a mortgage or lien attaches only to the property purchased, no debt is created within the meaning of art. XI, sec. 3. However, where a mortgage is imposed on property existing or already owned by the municipality to secure the purchase price, municipal debt is created within the meaning of art. XI, sec. 3.

The purpose of the debt limitation placed upon municipal corporations by art. XI, sec. 3 is to prevent municipal bankruptcy which would result from the creation of a fiscal burden beyond the financial capacity of local taxpayers, *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 404, 147 N. W. 2d 304. Pursuant to sec. 66.521, Stats., and the resolution of the common council of the city of Kaukauna, the bonds issued by the city are payable solely out of the rentals or revenues to be derived from the project. While a lien is placed upon the revenues and the property to be acquired, no lien is imposed upon city property owned prior to the issuance of the bonds. Upon default and in the event of sale of the project, the municipality would be placed in the same position as it had been prior to the issuance of the bonds. No municipal debt is created within the meaning of art. XI, sec. 3.

*Conveyance of land: Art. XI, sec. 3a of the constitution; option to renew lease.*

Art. XI, sec. 3a of the constitution authorizes the state, or its political subdivisions, to acquire by gift, dedi-

cation, purchase, or condemnation, lands for municipal improvements and sites for public buildings. The state and its political subdivisions may convey such real estate thus acquired and not necessary for such improvements.

Respondent claims art. XI, sec. 3a, constitutes a restriction upon the municipal power to acquire and convey property, and that the lease between the city and Hammermill, which provides an option to purchase to Hammermill, fails to comply with art. XI, sec. 3a, in that the option to purchase is not conditioned upon a municipal determination that no portion of the lands to be sold are necessary for public improvements.

In *State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 72 N. W. 2d 577, it was argued that the state's conveyance of real estate to a private corporation to facilitate the construction of university buildings was contrary to art. XI, sec. 3a. This court concluded that it was not. At pages 53 and 54, the history and application of this provision was discussed in the following manner:

"Prior to the adoption of this constitutional provision the state possessed the power to acquire lands for public purposes and to dispose of the same. There is in the provision no express restriction on the power of the state to convey land. It cannot be held by implication that the legislature is precluded from authorizing such sale. A restriction to such effect would necessarily have to be expressed in words. There is no such expression here.

"This constitutional provision came into being in the form of an amendment in 1912. It relates not only to the state, but also to cities. Records in the Wisconsin legislative reference library indicate that the purpose of its adoption related to the problem of excess condemnation. In the notes to this section, Wis. Anno. (1930), 112, 113, appears a synopsis of the opinion in *Cincinnati v. Vester* (1930), 281 U. S. 439, 50 Sup. Ct. 360, 74 L. Ed. 950, where it was pointed out that the power given by this section must be so exercised as not to conflict with the Fourteenth amendment to the United States constitution,

and where it was held that excess condemnation by a municipality in the absence of definition of use, as required by the statute, must fail.

"Clearly there was in the adoption of this provision an attempt to broaden the public purpose for which the power of eminent domain might be exercised. Were it to be considered a restriction, unreasonable results would follow, for then, once the state had acquired the land for the purpose of developing a public building thereon, it could never thereafter ever sell it even though it was frustrated in carrying out its purpose of constructing the building.

"We are obliged to determine that the provision is a grant of power which broadened the authority of the state and cities in the matter of excess condemnation in relation to the rights of the state and cities which had existed in such respects previous to the adoption of the provision. The state's conveyance of the real estate in question to the building corporation does not contravene sec. 3a, art. XI, Const."

Art. XI, sec. 3a, of the constitution does not constitute an absolute restriction upon the power of municipalities to convey land, and is inapplicable to the potential conveyance of the project by the city to Hammermill. *State ex rel. Evjue v. Seyberth* (1960), 9 Wis. 2d 274, 101 N. W. 2d 118; *Newell v. Kenosha* (1959), 7 Wis. 2d 516, 96 N. W. 2d 845.

The lease grants to Hammermill the right to renew the lease after the expiration of the original term for three successive periods of five years at a basic rental of $100 per month. Respondent contends that a municipality has no authority to grant renewals of leases in that sec. 66.521, Stats., contains no reference to the power to renew; and that the municipality has no power to grant renewal for a nominal rent in that it is beyond the power of a municipality to transfer municipal property at less than fair market value of the property.[14]

[14] *Hermann v. Lake Mills* (1957), 275 Wis. 537, 82 N. W. 2d 167.

Sec. 66.521, Stats., grants the municipality the power to "lease;" included therein is the power to renew the lease. The lease provides that all the terms of the lease, except the basic rental, shall apply during any renewal term. Hammermill would be obligated to the costs of insurance, taxes and utilities, maintenance and repair, and other provisions negating the burden of the city. The city will expend no funds to acquire the project; it loses nothing by bargaining to renew the lease for nominal rental.

Similar arguments have been considered and rejected in *Allardice v. Adams County, supra,* 476 Pac. 2d at p. 993; *Green v. City of Mt. Pleasant, supra,* 131 N. W. 2d at p. 25; *City of Pipestone v. Madsen, supra,* 178 N. W. 2d at p. 603; *Elliott v. McNair, supra,* 156 S. E. 2d at p. 432; *Reed v. City of Cheyenne, supra,* 429 Pac. 2d at p. 72. In *Elliott v. McNair, supra,* 250 S. C. at 95, 156 S. E. 2d at 432, the South Carolina Supreme Court stated:

"The argument of the appellant here assumes that the adequacy of the consideration for such an option must be measured as of the time of its exercise rather than as of the time the original lease agreement is made. The fact is that the granting of such option forms a part of the original consideration for the lease agreement, and being thus supported by a consideration deemed fully adequate by the County Board, cannot be said to amount to a donation of public property. . . ."

The renewal options contained in the lease do not invalidate the project.

*Uniformity of taxation.*

Sec. 66.521 (9), Stats., provides:

". . . When any industrial project acquired pursuant to this section is leased to a private person, the lessee shall be subject to taxation in the same amount and to

the same extent as though the lessee were the owner of the property. Taxes shall be assessed to the lessee of the real property and collected in the same manner as taxes assessed to owners of real property, *except that the taxes shall not become a lien against the property.* When due, the taxes shall constitute a debt due from the lessee to the taxing unit and shall be recoverable as provided by law." (Emphasis supplied.)

Respondent argues that, while a municipality normally has a lien for the payment of taxes on private property,[15] the property of the Hammermill project is not subject to such a lien, contrary to art. VIII, sec. 1 of the constitution.

Art. VIII, sec. 1, provides, in part: "The rule of taxation shall be uniform . . . ." The object of this provision of this section is to protect the citizen against unequal and consequently unjust taxation. *Weeks v. City of Milwaukee* (1860), 10 Wis. 186 (*242). "Uniformity of taxation" means taxation which acts alike on all persons similarly situated. *Estate of Heuel* (1958), 4 Wis. 2d 400, 90 N. W. 2d 634; *Barnes v. West Allis* (1957), 275 Wis. 31, 81 N. W. 2d 75.

The tax lien on real estate is a matter of enforcement rather than rate of taxation. It was stated in *Flanders v. Town of Merrimack* (1880), 48 Wis. 567, 573, 4 N. W. 741, that:

"The method of enforcing payment of a tax when legally assessed, is entirely within the discretion of the legislature. It may be made a lien upon the property assessed for taxation, and the same may be sold and the tax paid out of the proceeds; or payment may be enforced by distress and sale of the property of the person taxed; or it may be collected by suit at law; or, as in the present case, it may be enforced by requiring the person charged with an illegal tax, who seeks relief in equity, to pay the amount legally chargeable to him as a condition of relief. And it is possible that equity would not relieve

[15] Sec. 70.01, Stats.

against a tax assessed on correct principles in accordance with law, even though the statute prescribed no means to enforce payment. The methods of enforcing payment of taxes are not necessarily within the uniform rule of the constitution but, as just stated, are within the discretion of the legislature, and may be adapted to the exigencies of each particular class of cases. . . ."

It is generally held that a state may, without violating constitutional requirements, make reasonable and natural classifications with respect to the methods of collection of taxes, provided they do not effect an unequal burden upon the taxpayer.[16]

In *State ex rel. Owen v. Donald* (1915), 161 Wis. 188, 153 N. W. 238, this court determined that under this state's constitution the legislature could not provide for a sale at public auction with competitive bidding for the property of one delinquent taxpayer and an absolute forfeiture of the property of another delinquent taxpayer, there being nothing in the nature of the property to uphold such discrimination. The court was of the opinion that the "rule of taxation" was not limited to the mere rate of taxation but extends to those steps in enforcing collection of the tax which affects the burden of one taxpayer as compared to another. At page 195 it was stated:

"It having been decided by this court that the requirement that the rule of taxation be uniform is not limited to the mere rate of taxation, I think it follows that the statute in question transgresses this requirement as well as the Fourteenth amendment to the United States constitution. 'The rule of taxation' does not, I think, extend to all steps in enforcing collection of the tax. But it does extend to those important steps which are essential parts of the tax proceedings. Collection by demand or collection by enforcement process are such, and it would be intolerable, for illustration, that a certain favored class should have six months in which to pay their taxes while others must pay in six days. . . ."

---

[16] 84 C. J. S., *Taxation*, p. 107, sec. 32.

Whether taxes constitute a lien on the property does not affect the taxpayer's relative burden. The tax lien is concerned with the relationship among the creditors of the taxpayer, not that between the taxpayer and the state and other taxpayers. A lien is not an essential element of uniform taxation.[17] Sec. 66.521 (9), Stats., does not violate the "uniformity of taxation" rule of art. VIII, sec. 1.

*Equal protection.*

Respondent contends that sec. 66.521, Stats., constitutes legislation which grants to industrial enterprises privileges and benefits denied to nonindustrial enterprises, in violation of the equal protection provisions of both the Wisconsin and United States Constitutions.

Projects eligible for revenue bond financing pursuant to sec. 66.521, Stats., are limited to those provided in sub. (2) (b):

"(b) 'Project' means any buildings or improvements, real or personal property, whether or not in existence at the time of issuance of the bonds issued under this section, which shall be suitable for the use of any revenue producing enterprise or any combination of any 2 or more such enterprises engaged or to be engaged in the assembling, fabricating, manufacturing, mixing, processing, warehousing, storing or distributing of any products of agriculture, forestry, mining or manufacture, even though such products may require further treatment before delivery to the ultimate consumer, and shall include data processing, research and development and service activities connected with the industries and activities herein enumerated."

Both the constitutions of the state of Wisconsin and of the United States condemn laws which grant special privileges to a favored class. The very spirit of our

[17] *City of Gaylord v. City Clerk, supra,* 378 Mich. 273, 144 N. W. 2d 471.

institutions is against the granting of special privileges to a favored class. *State ex rel. Sonneborn v. Sylvester* (1965), 26 Wis. 2d 43, 49, 132 N. W. 2d 249; *Christoph v. Chilton* (1931), 205 Wis. 418, 421, 237 N. W. 134. However, the discretion of the legislature in making classifications is great. The court is not required under the law to find a proper classification, but the classification made by the legislature is presumed to be valid unless the court can say no state of facts can reasonably be conceived that would sustain it. *State ex rel. Real Estate Examining Bd. v. Gerhardt* (1968), 39 Wis. 2d 701, 710, 711, 159 N. W. 2d 622. This court in *State v. Duffy* (1972), 54 Wis. 2d 61, 65, 66, 194 N. W. 2d 624, stated:

"Equal protection of the law is denied only where the legislature has made irrational or arbitrary classifications. *Town of Vanden Broek v. Reitz* (1971), 53 Wis. 2d 87, 191 N. W. 2d 913; *State ex rel. Johnson v. Cady* (1971), 50 Wis. 2d 540, 185 N. W. 2d 306; *State ex rel. Schopf v. Schubert* (1970), 45 Wis. 2d 644, 173 N. W. 2d 673. The test is not whether some inequality results from the classification, *Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, but whether there exists any reasonable basis to justify the classification. *McGowan v. Maryland* (1961), 366 U. S. 420, 81 Sup. Ct. 1101, 6 L. Ed. 2d 393. . . ."

In *Cayo v. Milwaukee* (1969), 41 Wis. 2d 643, 649, 650, 165 N. W. 2d 198, 167 N. W. 2d 407, the rules governing proper legislative classification were delineated:

"The standards for proper classification within an ordinance were established by this court in *State ex rel. Ford Hopkins Co. v. Mayor.* They are:
" '(1) All classification must be based upon substantial distinctions which make one class really different from another.
" '(2) The classification adopted must be germane to the purpose of the law.
" '(3) The classification must not be based upon existing circumstances only. [The following sentence was

added to No. 3 by *State ex rel. Risch v. Trustees:* "It must not be so constituted as to preclude addition to the numbers included within a class."]

" '(4) To whatever class a law may apply, it must apply equally to each member thereof.

" ' . . .

" ' " '(5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation." '

"However, '[b]efore appellant can avail himself of these rules to challenge any distinctions' between legislative classifications, he 'must overcome a presumption that the classifications are reasonable and proper.'

"In *Kiley v. Chicago, M., & St. P. Ry.*, this court stated

" ' . . . the question whether there is room or necessity for classification is one resting primarily with the legislature, and no court is justified in declaring classification baseless unless it can say without doubt that no one could reasonably conclude that there is any substantial difference justifying different legislative treatment.'

"Thus the burden is on the appellant to show that there is no basis for the classifications . . . ."

All enterprises within the definition of "project" are treated the same pursuant to sec. 66.521, Stats. The legislature specifically found that it was the "industry" located in this state that was being induced to move their operations. To ease this economic drain upon the state, the legislature determined it was necessary to promote industrial enterprises. It cannot be said that the legislature's classification in sec. 66.521 is either irrational or arbitrary. Sec. 66.521 does not contradict the equal protection clauses of either the Wisconsin or United States Constitutions.

*Pollution abatement equipment within meaning of "project."*

Respondent contends that sec. 66.521, Stats., does not authorize the issuance of bonds for the purchase of

pollution abatement equipment. The purposes for which a municipality may issue revenue bonds under sec. 66.521 are defined by sub. (2) (b) to be ". . . any buildings or *improvements*, real or personal property . . . which shall be suitable for the use of any revenue producing enterprise . . ." including "service activities connected with the industries . . . ." "Improvements" are defined in sub. (2) (c) to be property of any kind ". . . that can be used or that will be useful in an industrial enterprise . . . ."

The same contention was made and rejected in *Fickes v. Missoula County, supra,* and *State v. Putnam County Development Authority* (Fla. 1971), 249 So. 2d 6. In *Fickes v. Missoula County, supra,* 155 Mont. at p. 270, 470 Pac. 2d at p. 293, the Montana Supreme Court stated:

". . . While it is true that pollution controls or any other equipment useful in an industrial project are not specifically named in the Act, yet the legislature made it clear in section 11—4107 that it intended to cover many items when it specified in its provisions for the use of proceeds of bond sales that they could be used for 'acquiring or improving' and the terms 'all or any part of a project.' "

Hammermill is a revenue producing enterprise engaged in the manufacture of paper products. The pollution abatement facilities are suitable for the use of Hammermill. The definition of "improvements" is sufficiently broad to cover pollution abatement equipment. The project envisioned by the city of Kaukauna and Hammermill is within the scope of those "projects" authorized by sec. 66.521, Stats.

*Depreciation account.*

Sec. 66.521 (3) (c), Stats., provides that a municipality may enter into a lease purchase agreement which

"shall" among other things provide for an "adequate depreciation account."

In the instant case, the lease does not provide for the establishment of a specific "depreciation account." However, the statutory requirements are recognized in the bonding resolution adopted by the city on November 21, 1972. Paragraph 11 of the bonding resolution recites certain obligations, in addition to the rental payments required, placed upon the lessee by the lease, and states, ". . . it is the finding and determination of this council that the lessee shall not be required to build up or maintain reserves for depreciation. . ." and that the enumerated obligations of the lessee, ". . . adequately protect the interest of the city. . . ."

Also, in this case the Project Purchase And Financing Agreement provides that the city will sell and the Marine National Exchange Bank of Milwaukee, and the First National Bank of Appleton, will buy the bonds to be issued in the development of the project. The agreement contains a schedule of bond maturities and provisions for the determination of interest rates.

The point is argued that the absence of any specific provision requiring a depreciation account invalidates the bond issue. We do not agree. The enabling statute, bonding resolution of the city, and the bonds themselves, all provide that the city has no obligation with respect to the payment thereof. The statute (sec. 66.521 (3) (c)) states that the lease agreement shall provide for an adequate depreciation account. The bonding resolution of the city considered this statutory requirement and specifically found and determined that the obligations assumed by the lessee, in addition to rental payments, were adequate protection and that, therefore, lessee would not be required to build up and maintain reserves for depreciation.

Whether the legislative determination of the city council, that the obligations assumed by the lessee are ade-

quate protection to the extent that the lessee is not required to build up and maintain reserves for depreciation, are in fact adequate protection, does not go to the validity of the bond issue, particularly insofar as the parties to this proceeding are concerned. Whether the findings of a municipality that the obligations assumed by a particular lessee were adequate protection so as to in fact provide for depreciation would depend upon the nature and extent of the individual project and the parties involved. Actually, such a legislative determination by a municipality more realistically affects the marketability of the particular bond issue than the validity of the bond issue itself. In the instant case, we have the Project Purchase And Financing Agreement whereby the two banks agree to purchase the bonds at the maturities and interest rates therein established. Under the facts of this case, the agreements and actions of the respective parties constitute compliance with the provisions of sub. (3) (c) of the act.[18]

*Payment of bonds from the proceeds of sales.*

The lease provides that Hammermill has the option to purchase the project in the event the premises are destroyed or condemned and in the event that the interest on the bonds is determined to be subject to the federal income tax. The Mortgage And Indenture of Trust provides that the bonds are subject to redemption in the event such option is exercised at a time the bonds are outstanding.

Respondent argues that these provisions are in contravention of sec. 66.521 (4) (a), Stats.

---

[18] We do not subscribe to the rationale of *City of Gaylord v. City Clerk, supra* (144 N. W. 2d 473), which case also considered this issue.

Sec. 66.521 (4) (a), Stats., provides, in part:

"(a) All bonds issued by a municipality, under the authority of this section shall be limited obligations of the municipality. The principal of and on such bonds shall be payable solely out of the *revenues derived from the leasing of the project* to be financed by the bonds so issued under this section. . . ." (Emphasis supplied.)

Sub. (4) (a) of the act is intended primarily for the protection of the municipality from any charge against its general credit or taxing powers. Provisions of the lease, and the Mortgage And Indenture of Trust, providing that the proceeds from the sale of the project to Hammermill are to be applied to payment of the bonds, do not constitute a charge upon the city's credit or taxing power. The bonds may be paid from any revenues derived by the municipality from the project pursuant to its agreement with Hammermill.

### *Private placement of bond issue.*

It is asserted that the agreement between Hammermill and the city violates sec. 66.521 (4) (d), Stats. Sub. (4) (d) provides:

"(d) Any bonds, issued under the authority of this section, *may be sold at public sale* in such manner and at such time or times as may be determined by the governing body to be most advantageous. The municipality may pay all expenses, premiums and commissions which the governing body may deem necessary or advantageous in connection with the authorization, sale and issuance thereof." (Emphasis supplied.)

Sub. (4) (d) of the act provides the bonds "may" be sold at public sale. For this court to construe this provision other than permissive, it must be shown that the clear intent of the legislature is otherwise. No such

intent has been demonstrated. The normal purpose of a public sale is to assure the best price, but here the city is unconcerned with the price. Price is of concern only to the corporation. Industrial development revenue bond financing projects are so complex that it is often essential to work and negotiate with the prospective bond purchaser from the initiation of the project. Sub. (4) (d) of the act does not require a public sale.

### Delegation of authority to trustee.

Respondent submits that the power given to the trustee under the Mortgage And Indenture of Trust to take possession of and manage the property upon default under the mortgage constitutes an unlawful delegation of municipal authority by the city to the trustee.

A municipality may, by contract, curtail its right to exercise functions of a business or proprietary nature, but, in the absence of express legislative authority, it cannot surrender or contract away its governmental functions and powers, and any attempt to surrender them is invalid.[19] In *Adamczyk v. Caledonia* (1971), 52 Wis. 2d 270, 275, 190 N. W. 2d 137, this court stated:

"A municipality, which is wholly a creature of legislatively delegated power, cannot by ordinance or contract bargain away that portion of the state's sovereignty which has been conferred upon it. 2 McQuillin, *Municipal Corporations* (3d ed.), p. 839, sec. 10.38, states the basic proposition:

" 'Unless authorized by statute or charter, a municipal corporation, in its public character as an agent of the state, cannot surrender, by contract or otherwise, any of its legislative and governmental functions and powers, including a partial surrender of such powers.' "

---

[19] 62 C. J. S., *Municipal Corporations*, pp. 281, 282, sec. 139.

However, the city has not surrendered any of its legislative and governmental functions or powers. Though the objectives of such projects may embrace some elements of governmental function, the plan for paying for the property must be deemed a proprietary venture. In rejecting a similar argument in *Allardice v. Adams County, supra,* 173 Colo. at page 151, 476 Pac. 2d at page 992, the court stated:

"The fact that the project is for a 'public purpose' does not necessarily make its existence or its function *municipal* in nature. . . . The participation as a 'lessor' does not constitute a 'municipal function.' "

The authority invested in the trustee by the Mortgage And Indenture of Trust does not constitute an unlawful delegation of municipal authority by the city of Kaukauna.

*By the Court.*—Declaratory judgment granted adjudging that ch. 278, sec. 1, Laws of 1969, which creates sec. 66.521, Stats., is a valid enactment; that the resolution adopted by the common council of the city of Kaukauna pursuant to sec. 66.521 is a valid enactment for the purposes set forth therein; and that respondent take all action as authorized and directed by such resolution.